Meriam *v.* Harsen.

## Meriam *vs.* Harsen and others.

The technical common law rule, that a feme covert cannot make a conveyance to her husband, does not apply to a conveyance made by the wife to her husband, through the medium of a third person.

In that manner a feme covert may exercise the same control over her real estate, for the benefit of her husband, as she could if it was held by a trustee, with a power in her to appoint it to whom she pleased. All that the court of chancery will do in such cases, is to see that the wife has not been imposed upon, by her husband, by his taking an unconscientious advantage of her situation.

The actual payment of the nominal consideration expressed in a deed, is not necessary to the validity of such deed. It is sufficient if it is stated in the deed to have been paid, as the consideration thereof.

As between the parties to a conveyance, where a mere nominal consideration is expressed in such conveyance for the purpose of supporting it, a court ought not to allow proof to be given of the non-payment of any consideration, in order to destroy the deed.

The rule of the English common law, which disabled a feme covert from conveying her real estate in any other manner than by a fine, or a common recovery, was never in force in the state of New-York. At least no such law has been in

Meriam *v.* Harsen.

existence here since the colonial act of May 6, 1691, was rejected by the crown, in 1697.

The act of February 16, 1771, to confirm certain ancient conveyances, and prescribing the mode of proving deeds, to be recorded, and all the subsequent statutes on the subject, are merely restrictive of the right which a feme covert possessed, by the common or customary law of the colony, to convey her estate by deed, with the concurrence of her husband.

A substantial compliance with the requirements of the statutes relative to the proof or acknowledgment of deeds is sufficient; and it is not necessary that the certificate of the acknowledgment should be in the precise words used in the statute.

*Held,* accordingly, that a certificate which stated that a feme covert acknowledged that she executed a deed *without any fear, threat, or compulsion of her husband,* was a sufficient compliance with a statute requiring an acknowledgment by a feme covert that she executed the deed *freely, without any fear or compulsion of her husband.*

The word *freely,* in the statute, is not used in a sense importing that the wife, in the execution of the deed, should act without a motive, or do it as a mere act of generosity, without any hope of present or future benefit. But it means that she has executed the deed without constraint or coercion, or fear of injury from the husband.

How far custom and usage may be applied to the construction of statutes respecting the proof and acknowledgment of deeds, and to the form of the certificate of acknowledgment.

Where real estate had come to the wife from her father and her grandfather, and she had conveyed it to her husband, through the medium of a third person, and the husband afterwards commenced a suit in chancery, in the name of himself and wife, for a partition of a part of the estate, and for other purposes, and the bill stated the original title of the wife to such real estate, without mentioning the subsequent conveyance of the property to the husband, and an interlocutory decree was made, declaring the rights of the complainants and defendants according to the case made by the bill; which suit was afterwards compromised and settled between the complainants and defendants, and mutual releases executed, conveying the interests of the defendants in certain portions of the property in controversy to the husband; *Held* that, as between the devisees of the husband and the heirs at law of the wife, the devisees were not estopped from showing that the lands actually belonged to the husband at the time of the filing of the bill, and at the time of the entering of the interlocutory decree in such suit.

THIS was an appeal from a decree of the late vice chancellor of the first circuit. Cornelius Cozine the elder, who died in 1765, owned a farm at Bloomingdale, containing about 100 acres. By his will he devised it to his five children, Garret, Cornelius, Balaam Johnson, Margaret, the wife of N. Fletcher, and Sarah, the wife of W. Swanston; and the location of the

part intended for each was stated in the will. He also owned four lots in Fair-street, now Fulton-street, in the city of New-York; which he devised to his five children equally. But his will contained a contingent limitation over to the survivors of his children, who should be then living, in case any of the devisees should die without leaving lawful issue. Soon after his death his children caused their several portions of the premises at Bloomingdale to be located and ascertained, by the city surveyor, as directed by the testator. And the same were set off to them in severalty, according to the will. Each took possession of his share of that part of the testator's estate, and held the same in severalty. The share set off to the testator's son Garret, in that division, consisting of about twenty acres on the west side of Bloomingdale road, and extending westwardly to the Hudson river, was a part of the lands in controversy in this cause. In addition to the share of Garret Cozine in his father's estate, he had acquired, by purchase, forty-seven acres of land at Bloomingdale, and five lots on Mott-street in the city of New-York; which several parcels of land were also in dispute in this cause. Garret died about the year 1772, leaving three children; but by the death of two of them without issue, his daughter Catharine, the grandmother of the complainant, became the sole owner of the real estate which belonged to her father at the time of his death. In 1774, Catharine Cozine married Jacob Harsen, and had by him three children; Cornelius, John, and Rachel. John died in 1801, without issue. Rachel married Henry Jackson, and died about a year after her brother John, leaving two children; Anna Maria, the complainant in this cause, and Catharine, who subsequently married J. O. Fay. Mrs. Harsen died in May, 1835, and Jacob Harsen, her husband, in July of the same year; leaving their son Cornelius, and the two daughters of Rachel Johnson, their only heirs at law.

Cornelius Cozine, the brother of Garret, died in 1774, without issue. And upon his death, his brother Balaam Johnson entered upon the lands which had been set off to Cornelius in severalty at Bloomingdale; claiming to be entitled to them un-

der the will of the latter.   And he also took possession of the four lots in Fair-street; but he subsequently gave up the possession of three of the last mentioned lots to the heirs, or representatives, of his brother Garret and of his two sisters.   He continued, however, in the possession of the lands set off to his brother Cornelius, at Bloomingdale, until the time of his death; claiming to hold the same under a deed from his father, to him and his brother Cornelius, and under the will of the latter. And his widow and children continued to claim the same after his death, and remained in possession thereof until the compromise of the chancery suit, as hereafter mentioned.

On the 28th of May, 1790, Jacob Harsen and Catharine his wife, for the nominal consideration of five shillings, as stated in the deed, conveyed to Gabriel Furman, the forty-seven acre lot at Bloomingdale, and the lots in Mott-street, owned by Garret Cozine in his lifetime, and the undivided part of the lands at Bloomingdale, and on Fair-street, to which Garret Cozine became entitled under the will of his father.   This deed was acknowledged by Harsen and wife, before John Ray, a master in chancery, and was recorded in the office of the clerk of the city and county of New-York, in August of the same year.   The certificate of acknowledgment of that deed was as follows:

"Be it remembered, that on the 29th day of May, in the year of our Lord 1790, before me John Ray, one of the masters in chancery for the state of New-York, personally appeared Jacob Harsen and Catharine his wife, and the said Jacob Harsen acknowledged that he sealed and delivered the within written indenture, as his voluntary act and deed for the uses and purposes within mentioned; and the said Catharine being examined by me, privately and apart from her husband, *acknowledged that she executed the same without any fear, threat, or compulsion of her husband;* and I having perused the said indenture and find therein no material errors or interlinations, except the words "feet six" on the fifty line, same page interlined, do allow the same to be recorded.   JOHN RAY."

On the 29th of May, 1790, Furman and his wife, for the nominal consideration of ten shillings, conveyed the same prem-

ises to Jacob Harsen in fee, by a deed of that date; which deed was also acknowledged before Master Ray, and was recorded at the same time as the other conveyance.

In 1794, Harsen and his wife, together with the heirs and representatives of Mrs. Fletcher and of Mrs. Swanston, the two daughters of Cornelius Cozine the elder, filed a bill in chancery against the widow and heirs of Balaam Johnson Cozine, to set aside a pretended deed from Cornelius Cozine the elder, to his sons Cornelius and Balaam Johnson, for the Bloomingdale farm; to be let into possession of three-fourths of the share which was devised to Cornelius Cozine the younger, by the will of his father, in the Bloomingdale farm and in the four lots in Fair-street; and for an account of the rents and profits thereof which had been received by the husband and father of the defendant, in his lifetime, or by them after his death; to have the amount of a debt which Garret Cozine became liable to pay for his father, and which Harsen and wife had been obliged to pay, declared a lien upon the estate of Cornelius Harsen the elder, and to compel the defendants to contribute their rateable proportions for the payment of that debt; and for a partition and sale of the lots in Fair-street. The bill also contained a prayer for general relief. That cause was brought to a hearing upon pleadings and proofs. And in July, 1808, Chancellor Lansing made an interlocutory decree therein, establishing the will of Cornelius Cozine the elder, and declaring that the farm at Bloomingdale became vested in his children under the will, and according to the allotment therein; subject to the limitation over if any of them died without issue. That decree further declared, that Harsen and wife, in her right, were entitled to the part of the farm which was specifically devised to Garret Cozine; that the complainants Hegeman and wife were entitled, in her right, to the part specifically devised to Mrs. Fletcher; and the complainant Sarah Starke to the part specifically devised to Mrs. Swanston; that each of them was in the same right entitled to one-fourth of the part specifically devised to Cornelius Cozine the younger; and that the defendants were entitled to the part specifically devised to Ba-

Meriam *v.* Harsen.

laam Johnson Cozine, and to one-fourth of the part specifically devised to Cornelius Cozine the younger; and that a commission be issued to make partition accordingly. The parties were by the decree declared to be each entitled, in the same rights, to one-fourth of the Fair-street lots, and it was referred to a master to ascertain and report whether those lots were capable of being divided without injury to the parties. The master was also directed to take an account of the rents and profits, and by whom received, and an account of the moneys due to Harsen and wife for payments made on account of the debt for which Garret Cozine was surety. And further directions were reserved until the coming in of the report. The defendants having intimated that they should appeal to the court for the correction of errors, the parties finally entered into a compromise; and in consequence thereof the suit was not prosecuted any further. The substance of that compromise, which was consummated in February, 1809, was that mutual quit-claims should be executed for the several portions of the Bloomingdale farm specifically devised, except as to the share which formerly belonged to Cornelius Cozine, the younger; which share they divided in certain proportions agreed upon. And mutual releases for rents and profits received were to be given. It was also agreed that the Fair-street lots should be sold, and the costs of the chancery suit and other expenses paid out of the proceeds; and that the residue of such proceeds should be divided by paying over one-fourth to Jacob Harsen, one-fourth to Hegeman in right of his wife, as the heir of Mrs. Fletcher, one-fourth to the heirs of Mrs. Swanston, and the other one-fourth to the defendants in that suit. That agreement was executed by all the parties, including Mrs. Harsen; and was duly acknowledged by them before a master in chancery on the 9th of February, 1809. On the same day, the other parties to the suit, except Mrs. Harsen, gave to Jacob Harsen the husband, a release and quit-claim of all their rights, interests, and claims to the twenty acres at Bloomingdale, which were devised to Garret Cozine by his father, and to about ten acres on the opposite side of the Bloomingdale road; as his share of the part devised to Corne-

lius Cozine the younger. The last mentioned ten acres was a few days afterwards conveyed by Harsen and his wife to their son Cornelius. In October, 1804, the corporation of the city gave to Jacob Harsen a water grant of lands, under the waters of the Hudson river, opposite his lands at Bloomingdale which originally came to his wife from her father, and her brother and sister. And in 1817, part of the lots in Mott-street were taken for the purpose of widening that street; and Harsen received from the corporation, as the damages sustained by the taking of the part of the Mott-street lots for that purpose, the sum of $6530. Upon the death of Mrs. Jackson, her two children, the complainant and her sister Catharine, being then in their infancy, were taken into the family of their grandfather Jacob Harsen; and continued to live with, and were supported by him until his death, with the exception of a very short interval between the marriage of the complainant and her divorce from her husband.

In March, 1835, about four months before the death of Jacob Harsen, and about six weeks before the death of his wife, he made and published his will, in the presence of three subscribing witnesses; by which he disposed of his property as follows: He gave to his wife all his household furniture, plate, stock, and other personal property in and about his mansion house and the premises where he then lived, and all the money that she might have in her possession, custody or care, at the time of his death; and he forbid his executors from calling her to account for the same. He also gave her a pecuniary legacy of $3000, to be paid to her immediately upon his death. And he devised to her, for life, his mansion house, and the fifteen acres of land upon which it stood; it being a part of the forty-seven acre lot at Bloomingdale, which originally came to her from her father, and from her brother and sister who died without issue. She was also to have the privilege of cutting fuel from an adjoining wood lot. These several bequests and provisions were, by the will, declared to be in lieu and bar of her dower in his estate. He then devised to his son Cornelius, in fee, certain wood land in the state of New-Jersey. He also devised to him for life,

Meriam *v.* Harsen.

several of the Mott-street lots at the corner of Mott and Chatham streets, part of the lands which came to the testator's wife from her father and from her brother and sister; to hold the same to the devisee for life, with remainder to his seven children; the shares of two of those children being vested in his executors as trustees for the lives of the cestuis que trust respectively, with remainder to their children. And he devised the residue of his lot in Mott-street, which came to his wife from her father and brother and sister, together with another lot on the opposite side of the street, to his executors, during the lives of his two granddaughters, the complainant and her sister Catharine, and of the survivor of them; in trust to receive the rents and profits thereof and to divide the same equally between them during their joint lives, for their separate use; and after the decease of either, to pay over the one-half of the rents and profits to the survivor for life, and the other half to the children of the testator's son Cornelius, during the same period; limiting the remainder in fee in that part of his property, after the death of the complainant and her sister Catharine, to the seven children of his son Cornelius.

He then devised in fee, to his grandson Doct. Jacob Harsen, one of the sons of Cornelius, his mansion house and a part of the forty-seven acre lot at Bloomingdale, subject to the life estate of the testator's wife in the mansion house and the fifteen acres of land occupied therewith; with a limitation over to his brothers and sisters in case he should die, without leaving issue, during the life of the testator. Another portion of the forty-seven acre lot at Bloomingdale, he devised to his executors, during the life of his grandson John P. R. Harsen, in trust to receive the rents and profits thereof and pay the same to his said grandson during his natural life. And after the grandson's death, he devised the same lands to such of the children of the said John P. R. Harsen, as should then be living, and to the descendants of such as should be dead leaving issue, per stirpes; with a limitation over in case of his death without issue.

His water lot at Bloomingdale, conveyed to him by the cor-

Meriam *v.* Harsen.

poration of New-York, in October, 1804, the testator devised to his two grandsons, Doct. J. Harsen and John P. R. Harsen, as tenants in common; and in case of the death of either in the lifetime of the testator, and without issue, the whole to go to the survivor. The twenty acre lot at Bloomingdale which was specifically devised to Garret Cozine, by the will of Cornelius Cozine his father, with the exception of the part of that lot which lies between the ninth and tenth avenues, the testator devised to the seven children of his son Cornelius; giving the shares of two of them to his executors in trust. And as to the part of the twenty acre lot between the ninth and tenth .cnues, it was not disposed of by the testator; his will containing no residuary devise of his real estate.

After giving certain legacies and bequests out of his personal estate, the testator bequeathed two-thirds of the residue thereof to his executors, in trust to invest the same, and pay one half of the income thereof to the complainant, and the other half to her sister Catharine during their respective lives; and to pay over the one half of the principal, upon the death of each of those granddaughters, to the children of his son Cornelius who should then be living. The remaining third of his residuary personal estate, the testator bequeathed to his grandson Doct. Jacob Harsen. And he appointed that grandson and the defendants J. A. Middleberger and J. Cockroft, his executors and trustees.

The will of Jacob Harsen was duly proved before the surrogate of New-York, as a will of real and personal estate, upon a contestation thereof by the complainant; and was allowed and admitted to record, by the surrogate, in October, 1835. And Middleberger and Cockroft assumed the execution thereof as executors and trustees.

In June, 1836, the complainant filed her bill in this cause against the executors, and against Cornelius Harsen and his children, and against her sister Catharine, and John O. Fay who had married such sister subsequent to the death of her grandfather. In this bill the complainant, among other things, alleged that the deed of the 28th of May, 1790, purporting to

have been executed by Jacob Harsen and wife to Gabriel Furman, was never executed by Mrs. Harsen; or, if it was, that it was obtained from her by the fraud and deceit of her husband, and was executed without her being aware of its nature and effect; and that it was delivered to the grantee conditionally, or in the nature of an escrow, and that the event upon which it was to take effect never occurred, as contemplated by the parties. She also insisted that the deed was not duly acknowledged, by Mrs. Harsen, so as to pass her title to the premises therein described to the grantee. She also set up the suit in chance ., commenced by Jacob Harsen and wife and others, in 1794, against the widow and heirs of Balaam Johnson Cozine, and the interlocutory decree made in that suit, as an estoppel to the claim of Jacob Harsen that the legal title to the lands, which formerly belonged to his wife, was in him by virtue of the conveyance to Furman and the reconveyance to himself. And she also charged that the release and quit-claim, of February, 1809, of the twenty acre lot at Bloomingdale, and of the ten acre lot at the same place, which were given to him by the other parties, in his own name, upon the compromise of the chancery suit, were taken by him in fraud of the rights of his wife under the decree. She also insisted that the grant of the water lot, from the corporation, taken by Jacob Harsen in his own name, in October, 1804, could not properly be made to any person other than the owner of the adjacent lands; and that it was obtained by Jacob Harsen under the pretext of his being the owner of such adjacent lands. The complainant therefore charged, that it was a fraud upon the rights of the heirs at law of his wife, for him to claim the water lot as against them; and that the complainant was entitled to the one undivided fourth part thereof. She also claimed, by her bill, that the damages received by Jacob Harsen, for the lands taken upon the widening of Mott-street, should be considered as real estate; and that she was entitled to the one-fourth part thereof, as one of the heirs of her grandmother Catharine Harsen. The complainant also charged, in her bill, that the will made by Jacob Harsen was invalid; that he was not of sound disposing mind, not

competent to make a valid will, at the time of the date of his pretended will; and that he was induced to make it by fraud and undue influence. She therefore prayed that the defendants might be decreed to deliver up the several deeds and releases to be cancelled; and that they might be decreed to convey to her the one-fourth of the lands described in the bill as formerly belonging to her grandmother Catharine Harsen, and that she might be quieted in her possession thereof; that she might be decreed to be entitled to one-fourth of the lands in controversy, and the one-fourth of the rents and profits thereof; that Jacob Harsen might be declared to have been seised of the water lot in trust for his wife, with the same beneficial interest in her that she had in the adjacent lands, and that the complainant might be declared entitled to one-fourth part thereof; and that one-fourth of the moneys received by Jacob Harsen for the damages, upon the widening of Mott-street, might be decreed to her, as a part of the real estate which belonged to her grandmother. She also prayed for an injunction and receiver, and for general relief.

Catharine Fay and J. O. Fay her husband, put in an answer admitting all the allegations in the bill, and concurring in the prayer thereof. The infant defendants put in general answers by their guardian ad litem. The other defendants put in answers denying that the conveyances of May, 1790, were not duly executed, or that they were obtained by fraud, or that the releases, conveyances and agreement, upon the compromise of the chancery suit, were fraudulent, or that Mrs. Harsen did not fully understand the same. And they insisted that the deed of May, 1790, was duly executed and acknowledged, in due form of law to pass her title to the lands described in that deed; and that the will of Jacob Harsen was properly executed, and that he was competent to make it. They also insisted that the complainant had a perfect remedy at law, if the allegations in her bill were true; and that the court of chancery ought not to entertain jurisdiction of the case. Replications to the answers of the several defendants were filed, and the parties proceeded to take their proofs.

Doct. Jacob Harsen, one of the defendants, having brought
an ejectment suit against the complainant, to recover the pos-
session of some of the lands devised to him, by the will of his
grandfather, she applied for an injunction to stay his proceed-
ings in that suit. And in February, 1837, the vice chancellor
before whom the bill in this cause was filed, granted an injunc-
tion; with liberty to the plaintiff to proceed to trial and judg-
ment in the ejectment suit, for the purpose of trying the
questions as to the validity of the deed of 1790, and the validity
of the will of Jacob Harsen deceased; but without prejudice to
the equitable rights of the complainant in respect to the charge of
fraud in obtaining the execution of the deed of May, 1790. That
ejectment suit was brought to trial, in the superior court of the
city of New-York, in November, 1837; and a verdict was
found for the plaintiff, subject to the opinion of the court upon
a case to be made. And the superior court afterwards gave
judgment in his favor, against the complainant Anna Maria
Meriam.

In October, 1838, Cornelius Harsen died; and shortly after-
wards Mrs. Prall, one of his daughters, also died, leaving seve-
ral children surviving her, who thereby became interested in
the subject matter of the litigation in this suit, under the will
of Jacob Harsen. The suit was therefore revived against those
children, and against the devisees of Cornelius Harsen, by a
bill in the nature of a bill of revivor and supplement. The
cause was subsequently heard before the late vice chancellor of
the first circuit, upon pleadings and proofs. He decided that
the deed of the 28th of May, 1790, from Jacob Harsen and
wife to Gabriel Furman, was duly acknowledged by Mrs. Har-
sen so as to pass and convey the real estate mentioned in the
deed; that the deed was executed by her, and that it was not
obtained by fraud or improper means; that by the conveyance
of the premises by Furman and wife to Jacob Harsen, the latter
became seised thereof in fee, for his own use, and that his title
was not impaired nor affected by the proceedings and decree in
the chancery suit commenced in 1794; and that the will of
Jacob Harsen was valid and properly executed. He therefore

made a decree dismissing the bill of the complainant, with costs to all the defendants except Fay and wife. From this decree the complainant appealed to the chancellor.

*Wm. S. Johnson,* for the appellant. The deeds from Jacob Harsen and Catharine his wife to Gabriel Furman, and from Furman and wife to Jacob Harsen, of the 28th and 29th May, 1790, did not pass the estate of Mrs. Harsen, to her husband, so that the same is governed by his will; but that estate has descended to Mrs. Catharine Harsen's heirs at law. A wife may give her estate to her husband, but the act is to be looked at with jealousy. (*Hulme* v. *Tenant,* 1 *Bro. C. C.* 16. *Ferris* v. *Brush,* 1 *Edw. Rep.* 572.) There must be no compulsion. (*Whitehall* v. *Clark,* 2 *Id.* 149.) It must be narrowly watched. (*Bradish* v. *Gibbs,* 3 *John. Ch. Rep.* 523, 549.) There must be no fraud or unfair advantage. (*Jaques* v. *The Methodist Church,* 17 *John. Rep.* 458, 598.) The cases on this subject are reviewed by Lord Eldon, in *Parker* v. *White,* (11 *Ves.* 222.)

The deed of Harsen and wife to Furman, of 28th May, 1790, was not duly acknowledged by Mrs. Harsen, nor is there a proper certificate of her acknowledgment under the act of 26th February, 1788, so as to pass her real estate. (2 *Greenl. Laws,* 99, § 3.) She did not acknowledge it *freely.* There is nothing in the certificate purporting her voluntary act. The defendants claim that the certificate is not only according to the statute, but also to the usage under the statute, and to the contemporaneous construction of the law. That it is substantially correct, and that it was not usual under the statute to insert the word *freely.* This form of certificate of acknowledgment by femes covert is prescribed by the statute, but not so as to other parties. (*Jackson* v. *Philips,* 9 *Cowen,* 111.) At the common law, conveyances by femes covert could only be made valid by matter of record founded upon an examination in open court. (*Watk. Conv.* 299.) In this state a private examination is allowed. By the Duke of York's charter, no estate of a feme covert could be sold or conveyed, except by deed, acknowledged by her in court,

Meriam *v.* Harsen.

of record; she being *secretly* examined whether she does it freely, without threats or compulsion of her husband. (2 *R. L. of* 1813, *App. V.*) The same language was used in the bill of rights of 1691. (*See Bradf. ed. Col. Laws, p.* 4; *Stat. of* 1771, *V. S. ed.* 611, § 2.) The act of 1778 improves the language of the act of 1771.

I find but one case in our own reports upon the statute as to conveyances by femes covert. (*Jackson* v. *Gilchrist,* 15 *John. Rep.* 89.) That was on a deed made in 1711. The separate examination of the wife, whose estate was conveyed, was not certified. But it was held good, because there was no statute regulation on the subject. There are, however, several cases in other states, than New-York. See the case of *Lessees of Watson* v. *Bailey,* (1 *Binn.* 470.) Yeates, J. said a literal strict adherence to the very words of the statute was not necessary, but the substantial requisites should be pursued. (*See also Tod* v. *Baylor,* 4 *Leigh,* 498; *Harvey* v. *Peck,* 1 *Munf.* 538; *Green* v. *Branton, Dev. Eq. Rep.* 500.) The cases relied upon by defendants, are the following, and are thus classified: Those where the acknowledgment was held good on the ground of usage, and to quiet titles. 1. Where the officer had omitted words indicating that the person acknowledging was the party described in the deed. (*Jackson* v. *Gumaer,* 2 *Cowen,* 552. *Troup* v. *Haight,* 1 *Hopk. Rep.* 239. *Thurman* v. *Cameron,* 24 *Wend.* 87. *McLean* v. *De Lancey's Lessees,* 5 *Cranch,* 30.) 2. Where the proof stated in the certificate was defective because the witness was not stated to be known to the officer, but the proof was certified to be satisfactory to the officer. (*Jackson* v. *Livingston,* 6 *John. Rep.* 149. *Jackson* v. *Harrow,* 11 *Id.* 434. *Jackson* v. *Vickory,* 1 *Wend.* 406.) 3. Cases arising under the acts of 1771 and 1778. (*Jackson* v. *Schoonmaker,* 2 *John. Rep.* 230.) Certificate of 1750. (*Jackson* v. *Gilchrist,* 15 *Id.* 89.) Certificate of 1711. (*Jackson* v. *Philips,* 9 *Cowen,* 96, 211. *Bradstreet* v. *Clarke,* 12 *Wend.* 602, 612.) Certificate of 1790. 4. Cases where the certificates of acknowledgment were held to be insufficient. (*Jackson* v. *Osborn,* 2 *Wend.* 555. *Jackson* v *Gould,* 7 *Wend.* 364.)

Meriam v. Harsen.

The general rule to be adduced from the cases is, that if the requirements of the statute have been substantially complied with, and usage has sanctioned the form, the certificate and execution are to be held good. The substantial requirement is, that the act of the wife shall be her voluntary, unrestrained, unbiassed, gracious, free act and deed. It requires more freedom in the wife, than that which exists in the absence of fear, threat or compulsion. If no more was meant, the word freely, would be useless in the act. *Freely*, as an English word, means more than the absence of fear, threat and compulsion. *Free*, not being under necessity or restraint, physical or moral. Gratuitous, not gained by importunity or purchase. Freely, without restraint, constraint or compulsion, voluntarily, spontaneously, without constraint or persuasion, gratuitously, of free will, grace, without purchase or consideration. (*Webster's Dict.*) Thus the language of this certificate does not satisfy the words of the statute in their proper English sense. It does not satisfy all the words of the statute. There is nothing in the certificate purporting a voluntary, spontaneous, gratuitous, gracious act of the wife, or freedom of action, though such words are used as to Mr. Harsen, to wit: voluntary act, &c.

The facts warrant the presumption that such words indicative of free action, were intentionally omitted, lest the certificate should be untrue in fact. In the certificate of acknowledgment by Furman and wife, made on the same day, before the same officer and doubtless at the same time, both parties acknowledge the deed as their voluntary act. Again, Mrs. Harsen was tenacious of her patrimony. She did not like Mr. Harsen's selling her property. She consulted no near relation as to the conveyance to Furman. She always asserted her ownership. It was herself who gave the land to her son Cornelius; and she was very anxious that her estate should remain in the family. The Furman deeds remained *sub rosa*, until after that suit ended in 1808 or 1809. *Usage* has not sanctioned this form of certificate. The maxim *communis error facit jus* does not therefore apply. The records of deeds have been extensively examined in New-York and in the office of the secretary of state. The

Meriam *v.* Harsen.

exhibits produced on the part of Fay and wife, show 213 certificates by Ray, from 1774 to 1803, of acknowledgments by the husband and wife recorded in the office of the secretary of state, and 837 recorded in the register's office in New-York from 1785 to 1805. Of these, 1043 are substantially correct. They show the voluntary act of the wife, either in the clause as to the acknowledgment both of the husband and wife, or as to the wife alone. And seven only are imperfect. Of these the Harsen deed is one. The exhibits of the other defendants show 660 certificates of acknowledgment under the act of 1788, in which the word freely is left out. But in these, some other word, importing voluntary action is substituted. I conclude, therefore, that the substantial requirement of the statute, that the wife should acknowledge that she *freely* executed the deed, was not complied with. The master's certificate does not comply with the requirement of the statute, by certifying that the wife did freely execute. Usage has not sanctioned the form of certificate used. The presumption from the evidence is that Mrs. Harsen did not execute the deed freely, in the sense of the statute. This last inference will appear more forcible in the consideration of the next position.

The conduct of the parties after the execution of the Furman deeds, proves that in their estimation, they were of no effect. That they were abandoned, or become inoperative, as on failure of the condition of an escrow. The deeds were made on the 28th and 29th days of May, 1790, and were recorded in August, in the same year. In 1794, Harsen and wife, with others, filed their bill in partition, and a final decree was made therein on the 13th of July, 1808. That bill and the decree in partition made thereon were clear recognitions of Mrs. Harsen's title, and estopped Jacob Harsen, and all claiming through him as volunteers, from denying the fact. The bill in that suit is based on the title of Mrs. Harsen to the property, as her patrimonial estate, and related to the same lands; and the decree affirmed the title to be in her. The averments in that bill were precise and affirmative, and the matter of those averments was traversable. They must therefore be taken to be true; and Jacob Harsen,

and those who claim through him, cannot be permitted now to deny them. (4 *Kent's Com.* 261, *n.* 2 *Prest. Ab.* 206 *to* 209, 213. *Wood* v. *Jackson*, 8 *Wend.* 9. *Elliott* v. *Hamilton*, 1 *N. Hamp. Rep.* 182.) The releases after the decree in partition, are not answers to this our claim of recognition and estoppel. Mrs. Harsen, as a feme covert, was not bound by the recitals in the agreement as to the Fair-street property. She would not be estopped by her covenant. (*Jackson* v. *Vanderheyden*, 17 *John. Rep.* 167. *Martin* v. *Dwelly*, 6 *Wend* 9, 14. *Butler* v. *Buckingham*, 5 *Day*, 492. *Watrous* v *Chaulker*, 7 *Conn.* 224.)

The releases were, or ought to have been made, in pursuance of and in execution of the decree. If they were so they vested the title in the husband for Mrs. Harsen's benefit and Jacob Harsen took it under the release of 9th February, 1809, as a trustee for his wife. But if they were not made in execution of the decree, then Mrs. Harsen executed the agreement only in respect to her dower. If Jacob Harsen is not bound by his pleading as to the title of his wife, how can she be bound by a recital in a contract executed by her when covert?

We claim the title on the broad ground that, by construction of law, an.l more especially of equity, the Furman deeds, if well executed, vested in Jacob Harsen only a life estate; a marital estate for the benefit of himself and wife for his life, remainder on his death in fee to the heirs at law of Mrs. Harsen. There was no consideration passed for the deeds. A nominal consideration of five shillings only is stated therein. There was no settlement by Mr. Harsen on his wife, for he was too poor to make one. A wife may give her estate to her husband. But the particular act is to be looked at with jealousy. (2 *Kent's Com.* 166.) A wife may bargain with her husband for transfer of property from him to her, if for a bona fide and valuable consideration. (*Livingston* v. *Livingston*, 2 *John. Ch. Rep.* 537. *Lady Arundell* v. *Phipps*, 10 *Ves.* 139, 145, 146, 149. *Bullard* v. *Briggs*, 7 *Pick. Rep.* 533. *Garlick* v. *Strong*, 3 *Paige*, 440. *Ritchin* v. *Broadbent*, 2 *Jac. & Walk.* 455.)

And she may sell or mortgage her separate property for her husband's debts. (2 *Kent's Com.* 167.) But as between husband and wife, the debt will be treated as the husband's, and she will be entitled to payment out of his estate. (*Clinton* v. *Hooper,* 1 *Ves. jr.* 186. *Niemcewicz* v. *Gahn,* 3 *Paige,* 614.) In the case of *Milnes* v. *Busk,* (2 *Ves. jr.* 488,) a wife who was entitled to the income of real estate as her separate property, appointed her husband to receive it, during her life. On a bill, by the husband's heirs, to have this income declared a part of his personal estate, it appeared that the husband consulted an attorney who devised this instrument; and he got the wife to execute it. And Lord Rosslyn decreed the income of the estate to belong to the wife. There, as in this case, they had lived on good terms, and the object of the appointment was to give the husband the management of estate. There were no words of conveyance, but his lordship said that if there were words of conveyance, under the circumstances he should set it aside. He says, a wife is not a *feme sole* as to her separate property in respect to her husband. It is against all the maxims of the common law. And he cites *Pawlet* v. *Delaval,* (2 *Ves.* 663.) In that case a separate estate of £23,000 came to Lady Pawlet. It was first settled as her separate estate; and it was afterwards invested for their joint benefit. After the death of Lord Pawlet, Lady Pawlet administered and treated half this sum as Lord Pawlet's. On the second marriage of Lady Pawlet with Delaval, this sum was by deed declared to be a part of the estate of Lord Pawlet. A bill by Delaval and wife to set aside this deed was dismissed. Lord Hardwick held the deed good; and that the money was part of Lord Pawlet's estate. But it was on the ground of Lady Pawlet's treatment of it while sole. In *Pybus* v. *Smith,* (1 *Ves. jr.* 189,) Mrs. Vernon appointed her trustees to pay her income for her husband's debt. Lord Thurlow directed an inquiry, as to how the deeds were executed. And it appearing by the report of the master that the wife knew what she was about, the deeds held good. (*See also Chassaing* v. *Panson-*

Meriam v. Harsen.

age, 5 Ves. 17. Whistler v. Newman, 4 Id. 129. Parker v. White, 11 Id. 209. Ellis v. Atkinson, 3 Bro. C. C. 565.)

Resulting trusts are implied by law from the manifest intentions of the parties, and the nature and justice of the case. As where the consideration is paid by one and the deed taken in the name of another; where the title is obtained by fraud; and where there is a purchase by a trustee with trust money, or a renewal of a lease by the trustee. So also where the purpose for which the estate was conveyed has failed, or a surplus remains after the purpose of the conveyance is effected. (Randall v. Bookey, Prec. Ch. 162. Emblyn v. Freeman, Id. 541. Stonehouse v. Evelyn, 3 P. Wms. 252. Digby v. Legard, Id. 22, n.) And the facts showing the resulting trust may be established by parol. (4 Kent's Com. 305. Willis v. Willes, 2 Atk. 71. Bartlett v. Pickersgill, 1 Edw. R. 515. Boyd v. McLean, 1 John. Ch. 582. Botsford v. Burr, 2 Id. 405. Sterrit v. Sleve, 5 Id. 1. Dorsey v. Clark, 4 Harr. & John. 551, Hall v. Spring, 7 Mart. Louis. Rep. 243. Powell v. Monson, 3 Mason, 362, 3. Start v. Cannady, 3 Littell, 399.) In the case of Strickland v. Aldridge, (9 Ves. 519,) there was a devise to defendant on a secret trust to build a chapel, against the statute of mortmain. And it was held that the grantee, on the ground of the fraud, took the estate in trust for the heir of the testator. In Baldwin v. Rochford, (1 Wils. Rep. 229,) where sailors sold their right to prize money, the lord chancellor said, " Here is presumption of fraud, arising from the circumstances appearing in the cause—the great value of the thing sold, in proportion to the small price paid for it. By the Roman law the contract was void, if the consideration was less than half the value of the property. Mere inadequacy of price was not alone sufficient to set aside a contract."

J. W. Gerard, for the respondents. By Mrs. Catharine Harsen's deed to Gabriel Furman, dated 28th May, 1790, and the deed from Furman and wife to the testator, Jacob Harsen, the next day, acquired a perfect title in fee to the lands of Mrs. Harsen therein described. This mode of conveyance, so as to

Meriam v. Harsen.

vest the lands of a feme covert in her husband, always existed in the colonies, and has become one of the common assurances of land, under which numerous titles are held. And by the usages of the colonies of New-York, Pennsylvania and others, no acknowledgment of the wife, before any magistrate, was requisite to give validity to the deeds. Our acts requiring a private examination of the wife, were not passed to enable her to convey, but to restrain her conveyance from operating unless duly acknowledged. This was decided by the court of errors, in *Constantine* v. *Van Winkle*, (6 *Hill's Rep.* 177.) I shall therefore make no argument on this point, but simply refer to the cases below. It is not averred in the bill, that by law the husband cannot thus become seised of the lands of the wife. But if it was, the law is well settled the other way. (*Jackson* v. *Stevens*, 16 *John.* 110.) Stebbins, senator, there says, an indirect mode of conveyance is no fraud upon the law, when resorted to in order to remedy a want of capacity to convey directly. (2 *Kent's Com.* 151, 2d ed. *Reeve's Dom. Rel.* 106, 114. *Grout* v. *Townsend*, 2 *Hill's Rep.* 556. 1 *Dallas*, 11, 17.) The act of 1771, (3 *R. S. App. p.* 22,) shows that the custom in this country in the colonies, was for femes covert to pass away their estate without any acknowledgment.

The deed of Mrs. Harsen was properly acknowledged by her, under the act of 26th February, 1788, (2 *Greenl. Laws*, 99,) before John Ray, master in chancery, who allowed the deed to be recorded; the act being substantially complied with. In *Jackson* v. *Phillips*, (9 *Cowen*, 111,) it is held that the act does not prescribe the form, but the substance of the certificate of the officer. The same case shows that the identity of the parties need not be stated in the certificate, nor that the officer knew the witness, nor the witness the party. The question is *res adjudicata* between Jacob Harsen and the complainant, by the ejectment suit in the superior court, where the acknowledgment was held good. The act does not say freely *and* without the fear or compulsion of her husband. If therefore she did it without the fear or compulsion of her husband, she did it freely. It is a conclusion of law from the facts. (7 *Mass. Rep.* 14. 2

Meriam *v.* Harsen.

*Id.* 291. 5 *Id.* 438. 9 *Id.* 161. 2 *Kent's Com.* 150, ed. of 1844.) The word *freely* is not in the certificate, and the word *thereto* is used in addition. The law meant to guard against the coercion of the husband alone. *Freely* is an inference of law; therefore the act does not say freely *and* without the fear or compulsion of her husband; but freely, without the fear or compulsion of her husband. The act need only be substantially complied with, not literally. (6 *John.* 149.) The act of 1801 required the witness to prove the identity of the grantor. The witness said he sincerely believed, and was almost confident of the identity of the grantor. And the master being satisfied, it was held good proof. In *Jackson* v. *Gilchrist*, (15 *John.* 89,) the deed was acknowledged in 1711, and omitted to state a private examination of the wife, and the certificate of the justice stated, that in 1711 A. and B. his wife came before him to acknowledge the indenture to be their acts and deeds. And it was held that it ought not to be understood to mean merely that the parties came before him to acknowledge the deed, but that they did acknowledge it; and that after a long time the private examination of the wife ought to be presumed. In *Jackson* v. *Gumaer*, (2 *Cowen*, 552,) the officer merely stated that the grantor was known to him; without saying, known to be the person described in and who executed the mortgage, as the law required to be inserted in the certificate. But it was held sufficient. And the court say the omission of that clause having been extensively practised in the state, so that many titles would be disturbed, by allowing it to affect the certificate, would perhaps amount to a construction of the act. At all events, it would render the court unwilling to listen to an objection for that cause. In the case of *Troup* v. *Haight*, (1 *Hopk. Rep.* 239,) there was a similar omission in the certificate. And the certificate was held good, under extensive usage. That long usage has great weight in the construction of the act, especially if many law officers have adopted it, appears from Chancellor Sanford's opinion in that case. As respects the language generally used in certificates, our exhibit No. 34 contains 660 acknowledgments, under the act of 1801, in which th

Meriam *v.* Harsen.

word *freely* is omitted. Some of these acknowledgments were taken before the highest judicial officers in the state. Our exhibit No. 35 contains 261 acknowledgments, where the private examination of the wife, and which is all that is operative against her, is in the precise words of the one in question. To hold this acknowledgment bad, would overturn hundreds of titles in the state, and produce extensive mischief. The presumption is that every officer does his duty. Master Ray was satisfied that it was her *free* act; for on her acknowledgment he allowed the deed to be recorded. (*See Comyn's Dig. Franchise, C. ; Dwarris on Stat.* 693; 2 *Harris & McHenry,* 19; 4 *Halst. Rep.* 225.) If the complainant relies on the case of *The Lessee of Watson* v. *Bailey,* (1 *Binn.* 470,) the answer is that the acknowledgment in that case was not a substantial or attempted compliance with the statute, but was in a form which the statute had expressly abolished. The court there recognized a substantial compliance as being sufficient. The judge also recognized the maxim, *communis error facit lex.* And he said if his decision would unsettle many estates, he should pause long before he gave the decision. In *Kirk* v. *Dean,* (2 *Binn.* 341,) the point came up whether it applied to cases of dower. Two judges held it did ; but Yeates, J. who decided the former case, true to his position that he would not make a decision to unsettle many estates, dissented. All the cases in Pennsylvania hold that a substantial compliance with the act is sufficient. In the case of *The Lessee of McIntyre* v. *Ward,* (5 *Binn.* 296,) the certificate omitted what the act required, that the judge should read to the wife, or otherwise make known to her, the full contents of the deed. The court say it is enough if in any manner it appears the contents were made known to her ; the words of the act need not be used, if its directions are substantially complied with. In acknowledging she conveyed the lands within mentioned, it is to be presumed the lands were mentioned when taking the acknowledgment, though not so stated in the certificate. In *Shaller* v. *Brand,* (6 *Binn.* 438,) where the law required that the wife should have executed it voluntarily and of her own free will and accord, without coercion or

Meriam v. Harsen.

compulsion of her husband, not one of these words was in the certificate. It only stated, after the contents were made known to her, that she voluntarily consented thereto.

The receipt of the five shillings consideration money being acknowledged in the body of the deed to Gabriel Furman to have been received from him, under seal, and also a separate receipt for it endorsed under seal, the complainant is precluded from charging or proving that it was not paid, or from inquiring into the same; the acknowledgment in the deeds and in the separate receipt being *conclusive evidence* of its payment, against the grantor and all claiming under her. In a deed of gift, not founded in fact upon a pecuniary consideration, or a consideration of blood or marriage, but consummated by merely inserting a nominal sum of money, the *actual* payment of such consideration, the grantor and those claiming under him, will not be permitted to disprove. (*Bank of U. S. v. Houseman*, 6 *Paige*, 527. 2 *Hill*, 556.) Here there is no proof that it was not paid. And if such proof were allowed, half of men's contracts would be nullified. For the nominal consideration is never paid.

The averment in the amendment to the bill, that the deed from Mrs. Harsen to Gabriel Furman is a forgery, is false and is not pretended to be supported by any proof. So also as to the averments that the deed was never delivered; or that it was delivered in escrow, or upon some condition that has never occurred, or upon some trust.

The averment in the bill, that the deed of Mrs. Harsen to Gabriel Furman was obtained by fraud and deceit, of her husband, the testator, is also false; and it is not pretended to be supported by any proof. Who is it makes these charges of forgery and fraud upon this estimable man? Who traduces the dead by the vilest slanders? His own grandchildren who insulted him while living! Their relative, who fed and clothed and educated them through life, and who, on his death, left for them an ample competence. No man, woman, or child has dared to breathe a word of fraud or deceit against him, but his own unnatural descendants;—the Regan and the Goneril of

this drama ;—the modern Tarquinia, who profaned the sacred person of her aged grandsire when alive, and whom she now vilifies, and charges with every horrible crime, the moment the grave receives him. Let us examine the parties to this fraud: 1. Mrs. Harsen, a strong minded, intelligent woman ; not a bride, as the counsel once said, but a staid matron sixteen years married ; who having well tried him, had entire confidence in the character and prudence of her husband. 2. Mr. Harsen, then in the prime of his life, and in high character and standing ; a man of the most correct and honorable character, whose reputation through life has been proved by a phalanx of witnesses of characters equal to his own ; that he should turn re creant to the tenor of his whole life, and select as the victim of his fraud her, who of all others, he was bound to protect. Who speak disrespectfully of him ? Only the parties to the old chancery suit, and their descendants—no other individuals. 3. Mr. Gabriel Furman was to be the instrument of his fraud. His and her personal friend and associate. One of our most estimable men. Also, Mrs. Furman, his wife. 5. John Ray, the master. The fraud could not be committed without his connivance. A most honorable man, and exemplary officer. Also, the witnesses North and Hughes must have connived at fraud in the execution of the deeds. The deeds are large— there must have been great parade in their execution—seven persons were present. Mrs. Furman and Mrs. Harsen, if they did not know what they were about then, must have talked of it a hundred times, and Mrs. Furman would have asked her husband for explanations. And if he found that Mrs. H. did not understand what she had done, something would have been said. Inquiry would have been made. It was impossible to have deceived Mrs. Harsen into the execution of the deed.

The allegations in the bill, that Mrs. Harsen, till her death in 1835, treated the land as her own ; receiving the rents, acting as if it were her own, and exercising control; and also, that Jacob Harsen, her husband, did not assert any title by virtue of the Furman deeds, but treated it as the property of his wife, and abandoned those deeds as of no force, or that his conduct

showed he considered himself a trustee for his wife, are not only not proved, but are disproved by a mass of documents, facts and witnesses. Those averments being responsive to the bill, make the answer evidence. The acts of Jacob Harsen are from the date of his deeds in 1790, up to his death in 1835.

The answers, and the whole evidence in the cause, show that Mrs. Harsen never pretended to exercise any control or ownership over the property which a wife might not use in respect to her husband's own separate property. And that Mr. Harsen, from the date of the deeds in 1790 to his death in 1835, 45 years, claimed and exercised under those deeds, full, absolute and perfect dominion, over the property. The bill is false in saying she received rents, controlled the lands or acted as their mistress. The testimony proves the contrary.

In addition to the evidence furnished by the defendants, who were required to answer under oath, the following acts of testator show that he acted under the Furman deeds as conveying him the property, and as being operative up to his death. The greater part of which acts Mrs. Harsen must have known. And she never interfered with, but acquiesced in them. He gave publicity to the deeds, by recording them, when not necessary, in August following their execution. He granted, and the lessees took, long leases from Mr. Harsen, in his own name alone, from soon after the execution of the deeds in 1791, up to his death, 45 years. That fact shows his claim and the general knowledge, by the tenants, of his title. It also must have been known to Mrs. Harsen, who never made an objection. The leases were long. Inquiries must have been made. Bargains for the leases must have been made at his house, where she was present. And what tenant is produced to show that she interfered? He received the rents on the property, from the date of those deeds to his death, without dissent of Mrs. Harsen. Of course she must have known it. These tenants, most of them, lived in the immediate neighborhood. Those leases and rents covered all the period of the chancery suit. And then when they say he abandoned his claim, years after the chancery suit commenced, and four years before it terminated,

Meriam v. Harsen.

he received from the corporation a water grant to himself as owner of the adjoining property in fee. This shows his claim in fee; and that the corporation recognized it. Upon the compromising of the chancery suit, he received two releases of the property to himself, in 1809. In 1817, the corporation awarded to him his damages for widening Mott-street, as the owner in fee of the adjoining premises; which damages he received. This again shows his claim in fee, and the recognition of his title by the corporation. He also executed two or three wills, in which he claimed to dispose of the property in fee; and he gave his wife certain parts of his property in lieu of dower in his real estate. Every time he signed a will and prepared to die, he then commenced the fraud, if fraud it was—for not till then did he do any harm by the Furman deeds.

The bill and the decree in the chancery suit were not a recognition or admission by Mr. Harsen that his wife's estate and interest in the property remained unaltered, or that he thereby abandoned the deed of his wife to him, much less do they operate against him as a technical estoppel. The facts set forth in the chancery bill shew not only the propriety, but the absolute necessity that it should have been filed in their joint names. The bill cannot possibly operate as an estoppel. And if it did, it could only operate upon that one-fourth of one-fifth which was immediately deeded over to Cornelius Harsen. An estoppel of record is only between adverse parties, when something has been adjudicated in favor of one against the other. (2 *John. Rep.* 24, 12 *Wend.* 399. 5 *Id.* 245.) Here was no contest between the testator and his wife. The defendants had no interest in the question : they were not prejudiced, the way the bill was drawn. It was no subject matter of controversy to estop any body. How does the bill act as an estoppel? He does not claim title under the bill or decree. An estoppel must be mutual; but here the wife would not be estopped by any thing in the bill. (9 *Paige,* 255.)

If it was clear that the one-fourth of Cornelius' share was covered by the Furman deeds, and was in severalty, and Jacob Harsen had brought ejectment on his deed, how would he have declared. One count on a demise from himself, claiming

through his deed, and another count on a demise from himself and wife to guard against the objection that the deed did not operate on lands, as to which there was an adverse possession.

A bill in chancery is not only no technical estoppel, but unless sworn to, or signed by the complainant, is no evidence as to any allegations or admissions in it, in any collateral action. (1 *Phillips' Ev.* 358.   *Cowen & Hill's Notes, No.* 640, *p.* 923. 2 *Hall's Rep.* 433.   *Peake's Ev.* 54.   *Bell* v. *Thompson,* 1 *A. K. Marsh.* 511.)   This bill is neither sworn to, nor signed by Mr. Harsen, nor is there a particle of evidence that he ever laid his eyes upon it, or upon the decree.  ` `Knowledge is the essence of estoppel and admission.   Again ; the decree was abandoned and waived by all parties, and was never acted on.   Releases were given, on a compromise made, which do not pretend to carry out the decree, or have any reference to it.   A decree can only act on the bill, and make its averments evidence, not new and independent averments.   Now there is no averment in the bill inconsistent with the Furman deeds.   I again repeat, there is no averment in the bill, that Harsen and wife were seised in right of the wife, as the vice chancellor erroneously supposed. If the testator had obtained the deed by undue means he would have been careful not to commit himself by any averments in the bill, or by holding out the idea that his wife still held the property.  'But there are no such averments.   The testator could not have meant to waive his title, by the chancery suit ; for during its pendency he made long leases in his own name ; collected the rents in his own right ; claimed of the corporation a grant in fee of the water lot in 1804, and he did every act that an owner of lands in his own right, could do.   To show that he waived no title by the bill or decree ; that he claimed the lands as his own in his own right, and that Mrs. Harsen acquiesced in his claim, and knew that she had conveyed the title to him, the defendants refer to three releases executed on the 9th February, 1809, after the chancery suit was at an end.

The three releases executed on the termination of the chancery suit, are a perfect recognition, by Mrs. Harsen and by all the parties thereto, of the title of the testator.   They were exe-

cuted with great parade, and were witnessed by Riggs and Hildreth. There was no fraud in the execution thereof. Riggs, the drawer of these documents, well knew that the title was in the testator. He was one of the counsel who argued the cause, as appears from the decree; and he well knew the difference between what was Mrs. Harsen's share and those of the other female heirs; for where they and their husbands are mentioned the writing always says the husband and wife are seised in right of the wife. Riggs therefore drew the release to Mr. Harsen, based alone upon his title acquired under the Furman deeds. In the agreement to sell the Fair-street property, Mrs. Harsen is a party signing and acknowledging. It recites the compromise of the suit, and the express recognition of Mrs. H. and all the signers, that one-fourth belongs to Jacob Harsen, one-fourth to Lettice the wife of Peter Hegeman. Then in the agreement for the sale; the deeds were to be given to purchasers, and one-fourth of the proceeds were to belong to Jacob Harsen, one-fourth were to be paid to Hegeman and wife, in her right, and Hopper's and his wife's share, in her right, and of Bertine and wife in her right. So in the release of back rents, of the same date, which release Riggs drew and witnessed. It recites the compromise; that the suit was brought to recover back rents of the Bloomingdale and the Fair-street property, and to settle the personal estate of old Cornelius and the legacies under his will; and all claims which one party might have against the other as administratrix of the personal estate of old Cornelius; and states that the object is to release all such claims. Mrs. Harsen, as administratrix of her father, was properly a party to the deed; and this shows she was properly made a party to the suit. These solemn documents are a perfect answer to the ideas of Mrs. Harsen having the property, or that Mr. Harsen waived his title or only took a trust, or is estopped by the bill. The complainant, to oppose all this, gives evidence of Mrs. Harsen's loose declarations that the property was hers. Such declarations were not admissible as evidence. Declarations are to be received with great caution. Some of these were made some forty years ago, and some in her last sickness, when

Meriam *v.* Harsen.

she was disposing only of the $3000 left her by her husband's will. Those declarations, by the smallest change of words, are reconcileable with the idea that the property was once hers by inheritance.

*George Wood,* for the appellants, in reply. I propose to confine myself to two propositions, and to present them in the alternative. The deed from Catharine Harsen to her husband, was unreasonable and unconscientious, and obtained by undue influence and imposition,' or it was obtained for the mere purpose of giving him the legal title, to enable him to manage the property for her, and upon her behalf to execute leases and conveyances, for her benefit, but, subject to his marital interests during his life. If the latter was bona fide the object, and it was faithfully carried out, there was no fraud of any kind; but to prevent fraud, it must be carried out, or it becomes an engine of fraud, which equity will prevent. If it was merely an ostensible motive, then it stamps the whole transaction with fraud.

Assuming that Jacob Harsen designed to get from his wife a conveyance of her property, so as to vest himself with an absolute estate for his own account and benefit, it ought to be set aside, as fraudulent, in equity. It is not pretended that he *purchased* this property from his wife, or that there was any consideration for the conveyance, beyond the nominal consideration, technically necessary to give effect to the conveyance. To operate then in equity, it must take effect as a gift. The right of the wife, at common law, to her real estate, except so far as respects the qualified right of the husband, is just as strong and effectual as is her right in equity to property settled upon her in strict settlement. It was so held in *Gahn* v. *Niemcewicz,* (11 *Wend.* 316.) A wife may give property to her husband, as well as to any other person; though the old common law rule was otherwise. (*See Roper on Husband and Wife,* 53.) But the reasonableness of such gifts must depend on circumstances. If he is prudent and a portion of her estate is wanted for the maintenance of the family, it may be proper to give him a portion. If she has all the estate, and he has none, and she wants

Meriam v. Harsen.

to give him consideration, the gift may be proper. In this case, she gives him all, without any reserve—he bringing no estate with him into the family. If he should become unfortunate or should squander the property, she is left without support. Such a gift is most unreasonable; and the acceptance of it most unconscientious. It is impossible to conjecture, with the vice chancellor, that it proceeded from a proper sense of generosity on her part, and was accepted with a due sense of justice on his. We would rather say with Lord Hardwick, it is a transaction which no prudent person would enter into and no honest one require. (*Chesterfield* v. *Jansen*, 2 *Ves. sen.* 155.) Not only is no settlement made upon her, but not even a dollar of pin-money is reserved for her. Her husband's share is the lion's share. Such conduct is at war with proceedings usually had in equity in such cases. A court of equity requires a reasonable settlement to be made by the husband upon the wife, before it lends its aid to enable him to recover her property, which he is by law entitled to recover. The New-York rule goes farther. It will compel a husband to make a reasonable settlement; even when the aid of equity is not required. Sound practical morality calls upon a court to pronounce such a transaction unreasonable and unconscientious.

Again; the affair appears to have been shrouded in secrecy. None of Mrs. Harsen's relations were called in to advise with her upon the subject. Not one is brought forward to testify to it. These conveyances though recorded, were not known. The neighbors appear to have considered the property to be hers. Persons having the confidence of others and standing in a relation to them of commanding superiority, are bound to advise them, as though they were acting with others. (*Gibson* v. *Joyce*, 6 *Ves.* 271.) If she had been making a gift to a child or collateral relative, or to a person in distress, he would have felt it his duty to advise her. The gift being to himself he ought to have required her to take advice from some friend. The vice chancellor seems to have been aware of this; and therefore he introduces Judge Furman and his lady upon the stage as participating in the transaction, and he conjectures that all four

of them must have come together and consulted about it. But the judge has entirely forgotten it. Now. the evidence, if we are to take evidence instead of conjecture, is directly the other way. It is almost impossible to suppose that the judge could have forgotten such a scene as the imagination of the vice chancellor has pictured. But if called in simply to perform the naked ceremonial of receiving and executing a deed at the instance of a neighbor, nothing is more natural than that the event should have passed out of his mind. In these unconscientious bargains, if there be the least scintilla of fraud, a court will set them aside. (3 *Cowen,* 538.)

It is impossible to account for the proceedings in partition, on the supposition that Jacob Harsen was the real owner of this property, and that it was fairly obtained. He had lately procured it. He must have considered it important to himself to procure it. The counsel employed, was the late Mr. Harrison. If Harsen had produced these Furman deeds, they would never have been left out of that partition suit. Besides, the bill involved other claims. An accounting was to be had. Why then did he not produce those deeds to his solicitor and counsel? Did he forget them? That must have been impossible. Was he afraid if a serious controversy arose, her relations might have inquired into the matter; might have apprized his wife of the situation of the title, and awakened her to her true situation? That is much the most probable. After the whole affair is compromised, and the mere title deeds are to be executed, he instructs the new counsel he employs, to have the deeds executed to himself. All this would be done in a corner in the scrivener's office. No suspicion would then be awakened.

Again; the subsequent conduct and deportment of both husband and wife is incompatible with the idea that he had become the true *bona fide* owner of all this property. She, in his presence, treats it and deals with it as her own, and he does not object. The vice chancellor gets over this by saying that it was natural she should call it hers. But this will not answer. It is in important matters of business in relation to it and of disposal, that she, with his sanction, treats it and

Meriam v. Harsen.

deals with t as her own. There is some little contradiction in the testimony, but the weight of the evidence leads conclusively to this result. What is there to oppose to these views and considerations? He does not show that any relative, friend, or even acquaintance of hers was called in to advise with her in making this most unreasonable gift. The burden of showing this, was on their side. (6 *Ves. jun.* 278.) It is said she passed through the ceremonial of an acknowledgment, apart from her husband. True, these ceremonials are designed as safeguards, but it is held that they are very ineffectual safeguards. Their absence is defective—but where they exist very little weight is attached to them. Every practitioner at the bar has met with various instances of fortune-hunting husbands acquiring the property of their wives. And these ceremonials are always most religiously observed. But little importance has heretofore been attached to them by the vice chancellor himself. (*See Ferris* v. *Brush*, 1 *Edw. Ch. Rep.* 573.) In that case he was not satisfied with going through the ceremonial, like an ordinary magistrate—but required that she should attend at his chambers and be subject to a most rigid scrutiny. In the celebrated case of *Huguenin* v. *Baseley*, (14 *Ves.* 273,) all the ceremonials were duly complied with. So in *Whelan* v. *Whelan*, (3 *Cowen*, 572,) and in *Griffiths* v. *Robbins*, (3 *Mad. Rep.* 105.)

It is further said, that the character of old Jacob Harsen was so good, that it ought to overcome this charge. If we look at the whole evidence, his character would rather favor the idea that he had unduly procured these deeds. But we have nothing to do with character in this case. It is not in issue. (*Fowler* v. *Ætna Ins. Company*, 6 *Cowen*, 673.) In the case of *Huguenin* v. *Baseley*, (14 *Ves.* 273,) the clergyman had borne a good character, but the chancellor did not on that account shut his eyes to the true character of the transaction.

It cannot be pretended that lapse of time has barred this claim. The general rule unquestionably is, that courts will not favor stale transactions. And even where there is no positive bar, presumptions will be raised in favor of long continued

Meriam v. Harsen.

enjoyment by one party; and acquiescence by the other. But there are many exceptions to this rule. It ought not to apply to a case where the imposition originally practised, whatever it was, has continued down to the commencement of the suit, or nearly so, and where the party, especially in the case of a married woman, has been all the time subjected to the control of the other. When we look at the features of this transaction, and the subsequent conduct of the parties, we are at no loss to discover the character of the imposition practised. She was led to believe that the paper she executed was necessary and proper to enable him to manage the estate. The evidence shows she was ignorant, and illiterate, grossly so, considering the station in which she was born. It would have been an easy matter, for a grasping and fortune-hunting husband, to impress her mind with that opinion, without giving her any very definite idea of the character of the instrument she was executing. It is probable the subject afterwards passed out of her mind; for she never appears to have adverted to it, but she spoke of and treated the property as her own, and her husband encouraged her in that opinion. Now, the doctrine is too well settled to require the citation of authorities in this court, that while the delusion lasts, and until the veil of deception is removed from the eyes of the party deceived, lapse of time does not at all prejudice the remedy.

I now come to my second view of the case, which is, that Harsen obtained the conveyance in good faith; merely with a view to enable him the better to manage the property, and without intending to strip his wife of the beneficial ownership of the property. This aspect will best harmonize with the general current of the testimony; with the partition bill recognizing her title, and the subsequent conveyances to himself, and with her subsequent actions and directions respecting the property; with his concurrence. At the close of his life, when he was brought under an influence which led to his partial disposition of the property by will, we may readily account for his being induced to dispose of it as his own, without much imputation upon his character. The weakness of old age is subjected to influences

which call for the exercise of a charity in reference to moral imputation, which ought never to be indulged in for the sake of protecting the unjust gains of the grasping and avaricious, against the claims of suffering innocence. Now, if the husband obtained this property from his wife under such an understanding, a court of equity will charge it with a trust, in favor of her and her representatives, and compel its execution; because to violate the engagement would be to perpetrate a fraud. It is like the case of an heir promising the ancestor, if the estate is left to descend to him, he will give certain legacies to younger children. Equity will hold him to his engagements.

THE CHANCELLOR. There is nothing in this case from which any court could be authorized to infer that the deed of May, 1790, from Jacob Harsen and his wife to Gabriel Furman, was obtained by the husband by any fraud or undue means; or by taking an unconscientious advantage of her situation, and of the confidence which she reposed in him. It was not the case of a fortune-hunter marrying an heiress, and then taking advantage of her confidence in him, even during the honey-moon, to defraud her of her property. Although the property embraced in that deed has now become of very great value, it was worth, comparatively, but little at the time the deed was given, about sixty years since. At the time the parties were married, they were nearly on an equality as to property. For the wife then had nothing but an expectancy in one-third of her deceased father's estate, after the death of her mother. And it appears from the statement in the old bill in chancery, that the estate of her deceased father was so embarrassed as to be unable to pay the £100, for which Swanston had become his security, and for which a judgment was recovered against the widow and executrix in 1774. This was the same debt which Jacob Harsen was compelled to pay, on account of the estate of his father-in-law, with the accumulated interest and costs, about twelve years afterwards. The death of her sister, however, in 1788, left Mrs. Harsen the sole owner of that part of the property of her deceased father to which the title was not

Meriam v. Harsen.

contested, by the widow and children of her deceased uncle Balaam Johnson. And it was not an uncommon thing, even in those days, where property was thus situated, for the wife to vest the legal title in the husband, by means of a conveyance by the husband and wife to a third person, and a reconveyance by the latter to the husband. These parties had been sixteen years married, at the time of the conveyance of 1790. And the fact that the deeds were put upon record, in the city of New-York, a few months after they were executed, although there was then no law requiring deeds to be recorded, rebuts all presumptions that any fraud or concealment was intended, on the part of the husband. Nor is it true, as alleged in the bill in this case, that it was not generally known that the title to the property was in the husband; or that the wife was ignorant of that fact. Several leases of portions of the property, for terms of twenty-one years, executed by Jacob Harsen alone, were produced in evidence; which mode of leasing is inconsistent with the idea that the lessees supposed the legal title to be in the wife. And leases continued to be executed in that manner, by the husband alone, without being also executed by his wife, down to the time of his death. And in the latter part of his life when the infirmities of age compelled him to do business at home, many of those leases must have been executed at his residence, when his wife was present. Indeed the complainant herself is the subscribing witness to several of those leases, executed by her grandfather in the years 1823, 1824 and 1825, while she was living with him, and before her marriage. The answers of some of the defendants, responsive to the bill in this respect, as well as the testimony of witnesses on the part of the respondents, show that Mrs. Harsen was aware that the legal title to the property was in her husband. The testimony of the late General Bogardus renders it almost certain that she was consulted in relation to a will drawn for her husband nearly thirty years before her death, in which the husband made ample provision for her out of property which the complainant now insists Mrs. Harsen then believed to be her own already. There is very little doubt also, that she must have been consulted by

Meriam *v.* Harsen.

her husband in relation to his last will, in which he appears to have been so solicitous to provide every thing requisite for her comfort and gratification, in case she should survive him. I have no doubt, therefore, that Mrs. Harsen was perfectly aware what she was doing when she joined with her husband in the deed to Furman; for the purpose of having the legal title vested in her husband by a reconveyance to him.

The technical common law rule, that a feme covert cannot make a conveyance to her husband, does not apply to such a conveyance made through the medium of a third person. (*Jackson* v. *Stevens*, 16 *John. Rep.* 110.) In that way she may exercise the same control over her real estate, for his benefit, as she could if it was held by a trustee, with a power on her part to appoint it to whom she pleased. And all that this court allows itself to do in such cases, is to see that the wife has not been imposed upon by the husband's taking an unconscientious advantage of her situation. (*Pybert* v. *Smith*, 1 *Ves. jun. Rep.* 189. *Parkes* v. *White*, 11 *Idem*, 222. *Bradish* v. *Gibbs*, 3 *John. Ch. Rep.* 523.)

The actual payment of the nominal consideration, expressed in the deed, is not necessary. It is sufficient if it is stated in the deed as the consideration thereof. And as between the parties, where a mere nominal consideration is inserted in a conveyance for the purpose of supporting it, the court ought not to allow proof to be given of the non-payment of such nominal consideration, in order to destroy the deed. (*The Bank of the United States* v. *Houseman*, 6 *Paige's Rep.* 526. *Shep. Touch.* 222.)

The next question to be considered is, whether the acknow· ledgment of the deed was sufficient, as the law then stood, to render it valid as a conveyance by a feme covert. In examining this question, it must be recollected that the rule of the English common law, which disabled a feme covert from conveying her real estate in any other manner than by a fine, or a common recovery, was never in force in this state, either when it was a colony or since. At the least, no such law has been in existence in this state since the colonial act of the 6th of May,

1691, was rejected by the crown, in 1697. (3 *R. S.* 1*st ed. App.* 3.) The act of the 16th of February, 1771, to confirm certain ancient conveyances, and directing the manner of proving deeds to be recorded, (2 *Van Schaack's Laws of N. Y.*, 611,) and all the subsequent statutes on the subject, are merely restrictive of the right which a feme-covert possessed, by the common or customary law of the colony, to convey her estate by deed, with the concurrence of her husband. These restrictive statutes, which have been revised and re-enacted from time to time, are substantially in the same words in reference to the acknowledgment of the wife. The practice of the acknowledging and recording officers, and the decisions of the courts, under any of those statutes, may therefore properly be referred to, for the purpose of ascertaining the practical construction which has been given to the law on this subject.

The act of 1788, (2 *Greenl. Laws*, 99,) required an acknowledgment, by the feme covert, on a private examination, apart from her husband, that she executed the deed *freely, without any fear or compulsion of her husband.* And the acknowledging officer was required to endorse on the deed a certificate of such acknowledgment, " purporting that she had been privately examined, and confessed that she executed the same freely, without any fear or compulsion of her husband." And these last words are copied from the second section of the act of the 16th of February, 1771, on the same subject. If a literal compliance with the words of these statutes, as to the form of the certificate of the acknowledgment by the wife, should be decided to be necessary a very great proportion of the deeds executed by married women, since the act of 1771, would be found to be invalid. It has, therefore, very properly been held, not only here but in our sister states, that a substantial compliance with the requirements of the statutes, relative to the proof or acknowledgment of deeds, was all that was necessary ; and that it is not necessary that the certificate of the acknowledgment should be in the precise words used in the statute. (*Jackson v. Gumaer,* 9 *Cow. Rep.* 552. *Langhorne v. Hobson,* 4 *Leigh's Rep.* 224. *Tod v. Baylor, Idem,* 498.

*McConnel* v. *Reed*, 2 *Scam. Rep.* 371. *Sharpe* v. *Hamilton*, 7 *Halst. Rep.* 109. *Brown* v. *Farran*, 3 *Ham. Ohio Rep.* 151. *Skinner* v. *Fletcher*, 1 *Ired. Law Rep.* 313. *Hollingsworth* v. *McDonald*, 2 *Harr. & John. Rep.* 230.)

The word *freely* is not found in the certificate of the acknowledgment of the wife in the present case. And the question is, whether the words used in the certificate do not mean the same thing substantially; so that the certificate does in fact purport, or intend to show, that the wife executed the deed freely, or voluntarily. The object of the private examination of the wife, apart from her husband, is to ascertain whether the execution of the deed was her spontaneous act; or whether she was induced to execute it by coercion, or fear of ill usage, or other injury from her husband. It is not necessary that the wife should act without a motive, in the execution of the deed, or execute it as a mere act of generosity, without any hope of present or future benefit resulting from it. Nor is the word *freely*, in the statute, intended to be used in any such sense; but it there means, without constraint, coercion, or fear of injury from the husband, under whose power and control she is legally supposed to be. I think, therefore, that when Master Ray certified that he examined Mrs. Harsen privately and apart from her husband, as to her execution of the deed in question, and that she acknowledged she executed it without any fear, threat, or compulsion of her husband, his certificate was a substantial compliance with the statute. But even if this would have been a doubtful question originally, the maxim that *custom is the best interpreter of the law*, (4 *Inst.* 75,) is applicable to this case. In deciding upon the statute relative to jointures, in the case of the *Earl of Buckinghamshire* v. *Drury*, (2 *Eden's Rep.* 74,) Lord Mansfield acted upon that principle. He says, " consider also the usages and transactions of mankind upon it; the object of all laws with regard to real property is quiet and repose. As to practice, there has almost been only one opinion. The greatest conveyancers, the whole profession of the law," &c. Several of the courts in this country have also applied this legal maxim to the construction of statutes relative

Meriam *v.* Harsen.

to the proof and acknowledgment of deeds. (*See McKeen* v. *DeLancey's Lessee,* 5 *Cranch,* 32 ; *McFerran* v. *Powers,* 1 *Serg. & Rawle,* 106 ; *and Jackson* v. *Gumaer,* 2 *Cowen,* 567.)

One of my learned predecessors in this court, in reference to the construction of our statutes, relative to the form of the certificate of acknowledgment, says : " From the enactment of this provision concerning the acknowledgment of deeds, in 1797, until this time, certificates of acknowledgment have been made in different forms, and have been expressed in various terms. The most usual form has, I believe, been that which adopts the language of the statute. But various other forms have been used, and certificates, expressed in the language used in this instance, have certainly been very usual in all parts of the state. Certificates like this have been considered and treated as sufficient during twenty-seven years ; and a decision that they are not valid would subvert titles to lands to a very serious extent. They have been held sufficient not merely by recording officers, but by judicial officers who have taken acknow-ledgments, and have composed their certificates in this form ; by judges of the supreme court, judges of the county courts, masters of this court, and commissioners. This general usage, thus long continued and hitherto unquestioned, has great force ; and the practical construction of the law by so many public officers, though not given upon adverse litigation, must still have much of the weight of judicial decision. The construction which considers these certificates as a substantial compliance with the law is liberal, but not violent or unreasonable. This construction has prevailed so extensively, and for so long a period, that it possesses high authority, and to pronounce these certificates void would be a most dangerous innovation. I shall, therefore, in pursuance of the received interpretation of the law, consider the certificate upon which the mortgage to Troup· was registered sufficient, and the mortgage duly registered." (*Troup* v. *Haight, Hopk. Chan. Rep.* 267.)

Nearly every word of this part of the opinion of the late Chancellor Sanford, in *Troup* v. *Haight,* is directly applicable to the present case ; except that it can hardly be said

---

Meriam v. Harsen.

---

that the certificates of acknowledgments have been the most usual, by femes covert, in which the language of the statute has been adopted. For of the 660 acknowledgments, embraced in the respondent's exhibit No. 34, I believe there is not one in which the language of the statute is adopted throughout; though in most of them equivalent words are used. And a similar departure, from the precise language of the statute, will be found in most of the certificates produced on the other side. The only operative part of the certificate, in relation to the acknowledgment of a feme covert, is that which states what she acknowledged upon her private examination apart from her husband. For what she acknowledges or admits in his presence is no part of the acknowledgment of the deed, as to her. It will be seen, therefore, by the respondent's exhibit No. 35, that there are in the records of the city of New-York alone, 261 conveyances, by femes covert and their husbands, in which the acknowledgment, as to the wife, is in the same form as in the deed of 1790 from Jacob Harsen and wife to G. Furman. I also find, upon examination of the numerous certificates produced by the appellant herself, that in a great portion of them the language is the same, so far as relates to the private acknowledgment of the wife, as it is in the certificate endorsed upon this deed, and in the certificates embraced in exhibit No. 35, on the part of the respondents. For instance; in four out of the nine certificates, from books 67, 68 and 70, of deeds in the city of New-York, at the commencement of the appellant's exhibit H. No. 1, the certificate as to the acknowledgment of the feme covert is in this form: "And the said J. being examined by me privately and apart from her husband, acknowledged she executed the same without any fear, threat, or compulsion of her said husband;" without any other words to indicate that she acknowledged, on her private examination, that she executed the deed freely or voluntarily. And among the certificates produced by the respondents, and which are substantially in the same form, there are eight which were drawn by justices of the supreme court, five by Samuel Jones as recorder of the city of New-York, eleven by James Kent as a master in chancery

Meriam v. Harsen.

and about 230 by J. M. Hughes, John Ray and Jeremiah Lansing, also masters in chancery. Numerous titles, of course, depend upon this practical construction, which has been given to the statutes on this subject, by high judicial officers, and others, for the last sixty years. And, in the language of Chief Justice Tilghman, it would be unpardonable to disturb it now, by a critical examination of the words of the statutes. The vice chancellor, as well as the superior court, was therefore right in supposing that the deed of the 28th of May, 1790, was properly executed and acknowledged, so as to pass the legal title to the lands mentioned therein, to Gabriel Furman, the grantee in such deed; except one undivided fourth of the lands at Bloomingdale, which were specifically devised to Cornelius Cozine the younger, by the will of his father. And by the reconveyance, from Furman to Jacob Harsen, the latter became entitled to an estate in fee simple, in his own right, in all the lands to which Furman obtained the legal title under the deed from Jacob Harsen and wife to him.

If the will of Cornelius Cozine, the elder, is correctly stated in the bill in chancery, filed in 1794, and if the times of the respective deaths of Garret Cozine and of his brother Cornelius Cozine, the younger, are truly stated, it is at least doubtful whether Mrs. Harsen was ever entitled to any part of the real estate devised to her uncle Cornelius under the will of her grandfather. For the limitation over, upon the death of any of the devisees without issue, was not to all the other children of the testator; but it was to those of his children who should then be living. Indeed the person who drew the deed of 1790 was probably aware that the right of Mrs. Harsen to one-fourth of the real estate devised to her uncle Cornelius was questionable. For in the recitals in that deed it is not stated that Garret Cozine, or his children, became entitled, under the will of his father, to one *fourth* part of the real estate devised to his brother Cornelius. But the recital in the deed is, that Garret Cozine, under the will of his father, became entitled to *one undivided part* of the Bloomingdale farm and of the Fair-street lots; without stating what the extent of that undivided part was, under the will. The bill

in chancery, of 1794, also appears to have been drawn with the same care, in not stating the interest of Garret Cozine, or of Mrs. Harsen, in the one-fifth of the farm, and of the Fair-street lots devised to Cornelius Cozine the younger; though it is stated in that bill that the complainants applied to the widow and children of Balaam Johnson Cozine, and requested them to divide the property into four equal parts. The person who drew the bill appears to have been equally careful not to state what the present rights of Mrs. Harsen were, in any of the property which had come to her from her father and her brother and sister. Chancellor Lansing, in making his interlocutory decree in that suit, seems to have overlooked the fact that it appeared from the dates, stated in different parts of the bill, that Garret Cozine died about two years before his brother Cornelius. And if this fact was overlooked by the counsel for the defendants, upon the argument of that case, it might well have escaped the vigilance of the court. For I see that in one part of the bill the complainants charge and insist, that if Cornelius Cozine the younger did make a will, as pretended by the defendants, he had no right to devise the real estate which came to him by the will of his father; but that upon his death without issue, the same went to his surviving brothers and sisters, under the provisions of the will of Cornelius Cozine the elder. And in this part of the bill of 1794, Garret Cozine is actually named, as one of those survivors.

There were good reasons for saying nothing, in the bill of 1794, in relation to the deeds of May, 1790, and of the alteration of the rights of Jacob Harsen and his wife in consequence thereof. For as between themselves, they probably considered it as a matter of but little consequence, whether the legal title to their share of the Fair-street lots, and the other lands in dispute in that case, was declared to be in the one or the other. Besides, it appeared by that bill that the twenty acre lot of Cornelius Cozine the younger, at Bloomingdale, was held adversely by the widow and heirs of Balaam Johnson Cozine, in May 1790. The legal title to that lot, therefore, remained in Mrs. Harsen, notwithstanding the deed to Furman and the recon-

veyance to her husband. Both Harsen and wife, then, were necessary parties to that bill, for nearly all of the purposes for which it was filed. And it would have been perfectly useless to say any thing in that bill about the deeds of 1790 ; or for the defendants in that suit to refer to them in their answers, or in their proofs, even if they knew that such deeds had been executed. The bill not being sworn to, it was no evidence of any fact, as between Harsen and his wife. And the interlocutory decree of the chancellor, as a matter of course, was made in accordance with what he supposed the rights of Harsen and his wife to be, from the statement of the original title of Mrs. Harsen, in the bill.

That decree, so far as it settled the rights of the complainants and defendants in the Fair-street lots, and in the twenty acre lot at Bloomingdale, which was specifically devised to Cornelius Cozine the younger by the will of his father, and of which a partition was directed, might perhaps be considered as settling the rights of all parties as to those particular lands, if the decree should not be appealed from. But as between Harsen and his wife, and as between their heirs, there is nothing in that decree which could operate by way of estoppel to prevent them from showing the true state of the title ; even as to the twenty acre lot which was specifically devised to Garret Cozine by the will of his father. Much less could any thing in that decree operate as an estoppel in reference to the forty-seven acre lot at Bloomingdale and the Mottstreet lots, which Garret Cozine had acquired by purchase in his lifetime ; and which were not mentioned, or even alluded to, in such decree, or in the bill on which it was founded.

Harsen never claimed title to the twenty acre lot, at Bloomingdale, under that decree. But he claimed title to it under the deeds of May, 1790 ; which title was confirmed to him by the release and quit-claim deed that was obtained, from the heirs of Balaam Johnson Cozine and of his two sisters, under the compromise in February, 1809. The part of the twenty acre lot originally devised to Cornelius Cozine the younger, which was also embraced in that quit-claim deed, was conveyed by Jacob Harsen and his wife to their son Cornelius, by a deed of gift, a few days

after that compromise was completed.   And all the Fair-street lots must have been sold, and the proceeds divided, very soon thereafter.  No part then of the property which the decree directed to be partitioned, or which could have been partitioned in that suit, belonged either to Jacob Harsen or his wife at the time of their respective deaths.   The title of Jacob Harsen to the property in dispute in the present case, under the deeds of May, 1790, was therefore in no way impaired by any thing contained in the bill of 1794, or by any thing stated or declared in the interlocutory decree made in that suit.

The validity of the will of Jacob Harsen was not only estab-lished before the surrogate, but also upon the trial of the eject-ment suit, in the superior court in New-York.   And it is only necessary to say, that there is nothing in the testimony in the present case, to induce me to doubt that the testator was per-fectly competent to make a will, or that his will was duly executed.   The appellant's unnatural and abusive treatment of her aged grandfather, who had stood in the place of a parent to her, from infancy to womanhood, and who again furnished her a comfortable home when she was separated from her hus-band, is sufficient to account for the provisions of his will as to her ; without the necessity of supposing that his intellect had become impaired so far as to render him incompetent to make a valid will.   And the state of the sister's mind made the pro-visions of the will discreet and proper as to her.   For these reasons, even if this court had jurisdiction of a suit to set aside a will of real estate, the bill in this case was rightfully dismissed ; upon the ground that the complainant had wholly failed to sustain the allegations, in her bill, in relation to the validity of the will under which the respondents claimed title to the property in controversy.

The claim of the complainant to a part of the premises con-veyed to Jacob Harsen, as a water grant, in October, 1804, and to a part of the moneys received by him, from the corporation of New-York, for the damages sustained by the widening of Mott-street, necessarily falls with the failure of the other claims upon the estate of the testator.   It is unnecessary, therefore, to

inquire what would have been her equitable rights in respect to the water lot, or to the money received by her grandfa-. ther for damages, if she had succeeded in showing herself entitled to one-fourth of the real estate in controversy, as one of the heirs at law of her deceased grandmother.

The decree of the vice chancellor must be affirmed, with costs to be paid to the several respondents or their solicitors, or guardians ad litem ; except as to the defendants Fay and wife. And if the executors of the will of Jacob Harsen are not able to collect their costs from the appellant, they are to be at liberty to retain the same out of the personal estate of the testator which has come to their hands as such executors.