McBRIDE v. ASHLEY et al., Com'rs of Common Schools.

(Supreme Court, Special Term, Oneida County. September 1, 1915.)

1. MUNICIPAL CORPORATIONS ⨀996—TAXPAYER'S ACTION—STATUTE.

Under Code Civ. Proc. § 1925, providing that an action to prevent waste of or injury to the property of a municipality may be maintained against any officer by a citizen resident therein, and General Municipal Law (Consol. Laws, c. 24) § 51, providing that all officers in a municipality may be restrained from wasting the municipality's property by any person or corporation whose assessment shall amount to $1,000, a taxpayer's action will lie to restrain waste or injury to the property or funds of a municipality, or to prevent any illegal official act on the part of its officers.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 2166; Dec. Dig. ⨀996.]

2. MUNICIPAL CORPORATIONS ⨀996—TAXPAYER'S ACTION—BASIS.

A taxpayer's statutory action to restrain waste of the property of a municipality, or to prevent its officers from acting illegally, lies only to restrain illegal, wrongful, or dishonest official acts, and not to subject the official action of boards, officers, and municipal bodies acting within the limits of their jurisdiction and discretion, which some taxpayer may conceive to be unwise, improvident, or based on errors of judgment, to the supervision of an official tribunal.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 2166; Dec. Dig. ⨀996.]

3. SCHOOLS AND SCHOOL DISTRICTS ⨀73 — BUILDINGS — IMPROVEMENT — SCHOOL COMMISSIONERS.

Laws 1842, c. 137, provides for the election of six commissioners of common schools in the city of Utica, and defines their duties and powers. Second Class Cities Law (Consol. Laws, c. 53) § 120, creates a board of contract and supply for such cities, and apportions certain duties to the members thereof, "except as otherwise provided by law." Plaintiff, a taxpayer of the city of Utica, sought to enjoin the common school commissioners thereof from installing a ventilating system in two school buildings, on the ground that the powers of the commissioners under the law of 1842, had been impliedly abrogated by the Second Class Cities Law and vested in the board of contract and supply. Held, that there was no inconsistency between the provisions of the two acts in regard to the powers of the common school commissioners, which remain un-

⨀For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

affected by the Second Class Cities Law, so that they had power to install the proposed system.

[Ed. Note.—For other cases, see Schools and School Districts, Cent. Dig. §§ 179–181, 217; Dec. Dig. ☞73.]

4. INJUNCTION ☞136—INJUNCTION PENDENTE LITE.

Injunctions pendente lite, in effect determining a litigation, and giving the same relief sought to be obtained by the judgment, should be granted with great caution, and only in case of necessity.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 305, 306; Dec. Dig. ☞136.]

5. SCHOOLS AND SCHOOL DISTRICTS ☞80—PUBLIC SCHOOLS—BUILDINGS—BIDDING FOR VENTILATION.

Where common school commissioners' specifications for the ventilation of two school buildings mentioned the M. Ventilator Company only in regard to 3 parts of the work out of 25, such action of the school commissioners was not invalid, as requiring each bidder to use only material obtained from the M. Ventilator Company, or a concern making ventilation apparatus of the same type, thus preventing open and competitive bidding and creating a monopoly.

[Ed. Note.—For other cases, see Schools and School Districts, Cent. Dig. §§ 191–194; Dec. Dig. ☞80.]

6. SCHOOLS AND SCHOOL DISTRICTS ☞111—OFFICERS—TAXPAYER'S ACTION—CITY AS PARTY.

In a taxpayer's statutory action against school commissioners to restrain them from contracting for the installation of ventilating systems in school buildings, the city was a proper, but not a necessary, party.

[Ed. Note.—For other cases, see Schools and School Districts, Cent. Dig. §§ 265–268; Dec. Dig. ☞111.]

Action by John E. McBride against Franklin F. Ashley and others, as Commissioners of Common Schools in the City of Utica. Plaintiff moves for a temporary injunction. Denied.

Lee & Dowling, of Utica, for plaintiff.

August Merrill, of Utica, for defendants.

ROSS, J. The plaintiff, a citizen, a resident, and a taxpayer in the city of Utica, seeks to restrain the defendants, as commissioners of common schools in said city, from entering into any contract for installing in what is known as the Academy building, or in Kernan School, a unit or Monarch system of ventilation, or from entering into any contract whatever regarding the heating or ventilating of said building, or from awarding any contract under the notices set forth in the complaint.

[1] A taxpayer's action to restrain waste or injury to the property or funds of a municipality, or to prevent any illegal official act on the part of the officers of such municipality, will, in a proper case, lie under the provisions of section 1925 of the Code of Civil Procedure, or section 51 of the General Municipal Law. The provisions of section 51 of the General Municipal Law, are, as it seems to me, somewhat broader in their scope, and provide somewhat more specifically for an action to prevent illegal official acts, and in a proper case restitution; but the principles governing an action brought under either of the aforesaid provisions are substantially the same, and the

complaint in this case is broad and specific enough to be framed under either provision.

[2] The right of a taxpayer to maintain an action to prevent waste of or injury to the estate, funds, or other property of a county, town, city, or village, or to prevent an illegal official act, was passed upon by the Court of Appeals in 1891 in the case of Talcott v. City of Buffalo, 125 N. Y. 280, 26 N. E. 263. This, in brief, was an action by a taxpayer of that city to restrain the governing authorities from substituting electric lights for gas in one of its streets. It was alleged in substance that the street was already suitably lighted, that an actual majority of the taxpayers thereon did not desire a change, that the common council had entered into a contract with an electric light company to make the substitution, that the price charged by said company was exorbitant, and that the expense of lighting the street would be greatly increased. That court overruled the order and judgment of the General and Special Terms and sustained the demurrer. Mr. Judge O'Brien, in writing the opinion for the court, on page 286 of 125 N. Y., on page 264 of 26 N. E., uses the following language:

"The terms 'waste' and 'injury' used in this statute [referring to chapter 161, Laws of 1872, afterwards incorporated in section 1925 of the Code of Civil Procedure] comprehend only illegal, wrongful, or dishonest official acts, and were not intended to subject the official action of boards, officers, or municipal bodies acting within the limits of their jurisdiction and discretion, but which some taxpayer might conceive to be unwise, improvident, or based on errors of judgment, to the supervision of the judicial tribunals. It is believed that no action was ever maintained under this statute with the sanction of this court, without some proof or allegation that the official act or proceeding complained of was without power or was tainted by corruption or fraud."

The learned judge says further, on page 288 of 125 N. Y., on page 265 of 26 N. E.:

"Full force and effect can be given to the statute by confining it to a case where the acts complained of are without power, or where corruption, fraud, or bad faith, amounting to fraud, is charged. Any other construction would subject the discretionary action of all local officers and municipal bodies to review by the courts at the suit of the taxpayers, a result which would burden the courts with litigation, without increasing the efficiency of local administration."

While the words "without power" apply to illegal contracts, such as an agreement to pay public money to a monopoly, I do not understand that the courts have extended the scope of this action in an attempt to review the discretionary power of an official board or body or officer. As stated by the late Justice George W. Kennedy in an unreported case, Smith v. City of Syracuse, in which a taxpayer brought an action to restrain the purchase of a lot upon which to erect a schoolhouse, and it was claimed by the plaintiff that the price proposed to be paid was exorbitant, in deciding the application for an injunction:

"It is only when the undisputed evidence shows that the common council or other officers of a city threaten to squander its money or means that the court is justified in interfering with their official action. While I may think it unwise for the city to make this purchase and pay the price proposed, others equally well qualified may entertain an opposite view. The law has vested

the right to determine the wisdom of the measure in the board of education and the common council, and so long as they act fairly and in good faith it would be an act of judicial assumption for a court to interfere and attempt to correct an error in judgment by either. The motion to continue the temporary injunction is denied, and the same is vacated, with $10 costs to the defendants."

In the case of Ziegler v. Chapin, 126 N. Y. 342, on page 348, 27 N. E. 471, on page 472, Mr. Judge Finch, speaking for the court, says:

"We have quite recently declined [referring to the Talcott Case] to become arbitrators between taxpayers and their municipal officers in every instance of disagreeing opinions or conflicting judgments, and have decided that, jurisdiction in the officials existing, the courts can interfere in actions like that before us only where some fraud or collusion or bad faith is alleged and proved."

In Dunning v. County of Orange et al., 139 App. Div. 249, on page 251, 124 N. Y. Supp. 107, on page 108, the opinion of the court contains the following:

"There is neither allegation nor proof of any fraud or corruption in connection with the making of said contract or the official proceedings prior thereto. It is, therefore, incumbent upon plaintiff, if he would succeed, to establish that it is the result of illegal official acts. Unless he establishes this, it matters not how unwise or extravagant the contract appears, the court may not interfere."

Although the statutes in question have been under consideration in all the courts of this state, I understand that the authority of the Talcott Case remains unimpaired, and as there are no allegations of corruption or affirmative fraud, the plaintiff, to succeed, must show either that there is no statutory authority for the commissioners to make the contracts in question, or that, if such authority exists, the proposed contracts are illegal, and that the commissioners have acted in bad faith amounting to fraud. These claims will now be considered.

[3] Have the defendants the authority to make the contracts in question? It is claimed by the plaintiff that such authority must be found in the acts creating the charter of the cities of the second class, Laws of 1898, chapter 182, as amended; and also in the provisions of chapter 560, Laws of 1902, being an act relative to public instruction in cities of the second class. Without going into a detailed statement of the provisions of the acts last referred to, I simply state that, if these acts are applicable, there can be no doubt that the power to let the contracts in question rests with the board of contract and supply, and not with the defendants.

The several acts creating a charter for cities of the second class contain the usual provision that all statutes inconsistent with the provisions of these acts are repealed. I may state in passing the well-known principle that repeal of a law by implication is not favored. Section 120 of the Second Class Cities Law (chapter 55, Laws of 1909; Consol. Laws, c. 53), which creates a board of contract and supply and defines the duties of the members thereof, contains the following provision: "Except as otherwise provided by law." It seems to me that there is nothing inconsistent in the provisions of chapter 137, Laws of 1842 (hereafter specifically referred to), entitled "An

act in relation to the common schools in the city of Utica," and provides for the election of six commissioners of common schools and defines their duties, with the provisions creating a charter of second class cities.

It is to be noted in this connection, while not controlling, that chapter 182, Laws of 1898, entitled "An act for the government of cities of the second class," was amended by chapter 560, Laws of 1902, and that said amendment relative to the department of public instruction in cities of the second class was not re-enacted in the charters passed in 1908 and in 1909, although expressly referred to therein, that nothing should affect the validity of the provisions of said chapter 560; or, to state it in another way, the revisers of the charter of cities of the second class deemed it wise to separate the provisions relative to public instruction from the body of the charter itself.

Chapter 137, Laws of 1842, to which reference has been made, provides in detail the various powers and duties of the commissioners of common schools in the city of Utica. By the provisions of section 13 of said act it is provided:

"2—To purchase or hire schoolhouses, and rooms and lots or sites for school houses, and to fence and improve them as they deem proper.

"3—Upon such lots or sites, and upon any sites now owned by said city, to build, enlarge, alter, improve and repair schoolhouses, out houses and appurtenances as they may deem advisable."

Other provisions relate to their powers relative to their employing and paying teachers, custody of schoolhouses, and so on. This act has been from time to time amended, but the general trend of said amendments has been to enlarge rather than to restrict the powers of said board. The last amendment to said act was in 1909, chapter 85, providing in substance that said board should prepare an annual estimate of the money to pay the salaries of teachers, etc., and present the same to the board of estimate and apportionment, which said board shall include the same in its annual estimate of revenues and expenses.

Returning for a moment to a consideration of the provisions of chapter 560, Laws of 1902, relative to a department of public instruction in cities of the second class, it is provided by the terms of said act that there shall be a board of education composed of three members appointed by the mayor, and prescribes the duties of such board of education. Upon the argument in this case, the learned counsel for the plaintiff admitted that the defendants; commissioners of common schools of the city of Utica, had the general power of the management of the schools of said city, that is, the power to hire and discharge teachers and provide the course of instruction, and so on, but contended that the power given them by the act of 1842 to build and repair schoolhouses no longer existed. I do not agree with the position of the learned counsel in this regard. It would seem that the direction of the general plan of instruction and education of the young of a city is as important as the occasional construction of a schoolhouse, and it seems to me there is no stronger reason for retaining the board of common school commissioners for one purpose than for another. If the act of 1842 is repealed by implication, such repeal

eliminates the board itself and is not confined to any of the specific provisions which define its duties.

This matter has, however, as I understand it, been passed on by a Special Term in this judicial district, in the case of People of the State of New York ex rel. Charles G. Irish v. John A. Cantwell, Clerk of Supreme Court, an application for a peremptory writ of mandamus to compel the defendant to make and transmit to the county clerk of the county of Oneida a notice that four commissioners of the common schools of the city of Utica are to be voted for at the coming election; it being alleged that in the notice he had served he had failed to certify and give notice that there were commissioners to be elected. The then corporation counsel, William Townsend, presented in opposition thereto his affidavit, in which he stated that chapter 560, Laws of 1902, was still in full force, and provides a complete system for the department of instruction in cities of the second class, and that after the 1st day of January, 1908, deponent verily believes the public schools of the city will be administered under and pursuant to chapter 560 of the Laws of 1902. Thereupon Justice William S. Andrews granted the prayer for peremptory writ of mandamus, and the four commissioners referred to in the moving papers were subsequently elected, and, as appears by the moving papers herein, said board of commissioners of common schools, and their successors, have continued to perform the duties prescribed by law, so that, in the absence of a reversal of said decision or an explanation of its being inadvertently made, it would seem to be, in the absence of strong reasons to the contrary, controlling.

But, before leaving the subject, I call attention to the fact that thereafter, and by chapter 244, Laws of 1908, the common council of the city of Utica was authorized to issue bonds upon the credit of the city to be denominated "school buildings repair funds," and provided that said money should be used by the commissioners of common schools in equipping, remodeling and repairing school buildings of the city, so as to safeguard the pupils and to facilitate their escape in case of fire. I also refer to chapter 85, Laws of 1909, to which reference has heretofore been made, for the purpose of showing that the existence and the authority and power of the defendants as commissioners of the common schools of the city of Utica has continued to be recognized—in other words, a "practical construction" of the application of chapter 137, Laws of 1842, and the acts amendatory thereto. Meriam v. Harsen, 2 Barb. Ch. 232, 269, 270.

The plaintiff claims that the unit or Monarch system of ventilation is not the best plan of ventilation, and he submits the result of experiments tending to show that under such system now in existence in other schools in the city of Utica, that the amount of fresh air supplied to each pupil is from 32 per cent. to 44 per cent. less than that which is required by the Education Law of the state of New York, and that in other respects, relative to fire risks, the system is not the best. It also is charged by the plaintiff that the cost of installing said unit or Monarch system, as compared with the Standard system of ventilation, will be in excess thereof to an amount of about $20,000, and then he

proceeds to state the advantages of the Standard system of ventilation, in which he is presumably interested.

[4] On the other hand, the defendants claim that distinguished experts have tested the heating and ventilating of the Monarch system now in operation in Utica, and that the result of such tests was uniformly approved by the department of education. Such conflicting claims are not unusual between rival concerns seeking to place their wares on the market, and so far as these rival claims of merit or demerit are concerned, for the reasons heretofore stated, this court is not going to substitute its judgment for that of the board of school commissioners. These issues being controverted, they should be submitted to the test of actual trial, and not determined upon affidavits. Maloney v. Katzenstein, 135 App. Div. 224, 120 N. Y. Supp. 418; Western N. Y. W. Co. v. Laughlin, 82 Misc. Rep. 496, 143 N. Y. Supp. 737, to the effect that:

"Injunctions pendente lite, which in effect determine a litigation, and give the same relief sought to be obtained by the judgment, should be granted with great caution and only where necessity requires."

[5] The plaintiff claims that the defendants will require each bidder for the ventilation of said buildings to use only material obtained from the Monarch Ventilator Company or a like concern, thereby preventing open and competitive bidding and creating a monopoly, which restriction is illegal, and that no one except the Monarch Ventilator Company could enter bids under the notices referred to in the complaint, because it is impossible to tell what kind of material or what will be required for the purposes of such installation, and it will be impossible to procure such material in the open market, thereby destroying competition and creating a monopoly.

The specifications for the material and workmanship required to install a Monarch system of heating and ventilating in the Academy building define the system of heating that is to be installed, and contain some 25 separate provisions as to what is to be furnished. The first specification to which this reference is made, simply by way of illustration, provides that the owner shall furnish the necessary heating boilers. The only specifications which in terms refer to the Monarch Ventilator Company relate to "boiler breeching" and "pressure regulators," and possibly to "automatic control." A reference to the last specification is enlightening. It provides in terms as follows:

"This contractor shall install the diaphragm temperature control valves which will be furnished by another contractor."

To be more precise, there is no inhibition, except as above stated, to the contractor from purchasing the materials in open market from anybody, and there is nothing, so far as I can understand, in the specifications indicating that the materials are patented or of unusual make or difficult to procure. Here is the distinction between this situation and the case of the contract of the city of Syracuse for the installation of the Gamewell fire and telegraph system. Grace v. Forbes, 64 Misc. Rep. 130, 118 N. Y. Supp. 1062. As pointed out in the very able opinion of Justice William S. Andrews in that case, the specifica-

tions provided that the sealed proposals should be received by the board of contract and supply for manufacture, delivery, and installation of relay boards, switchboards, recording and transmitting and other apparatus comprising a complete fire alarm telegraph central office equipment necessary for the operation of the fire alarm telegraph system of the city of Syracuse. Then followed a statement of what the equipment, material and work should consist of, and it seemed to have been taken, as stated by the learned justice, from specifications of patents taken upon their apparatus by the Gamewell Company, and still valid and in force.

It was found by the learned justice that it was practically impossible for any one else to furnish the materials called for by the specifications. But suppose that some of these articles purchased from the Monarch Ventilator Company were illegally purchased, I see no objection, notwithstanding that fact, in the defendants making a legal contract to the lowest bidder to install such materials. Suppose that in the Grace Case the city of Syracuse had purchased from the Gamewell people the material necessary for the construction of the fire alarm system, or that portion of it which would necessarily have to be furnished by that company, while such purchase might be illegal and would be subject to a restraining order or an action against the officials, I take it that there would be no legal objection in letting a contract to the lowest bidder for its installation.

The situation in regard to the Kernan School is somewhat unusual, and can best be indicated by a brief extract from the pleadings. The complaint (folios 20 and 21) contains the following:

"That as plaintiff is informed and believes under the specifications and plans for the heating and ventilating of the Kernan School the requirement is made that the ventilation shall be based upon the unit system, which is in other terms the Monarch system of ventilation; that each bidder must supply his own specifications and plans for the said system."

The answer (folio 10) contains the following:

"That the plans and specifications for heating and ventilating the Kernan School were prepared by the architect retained by the defendants, and were general plans and specifications, which provided that each bidder should submit in detail a layout of his proposed system of heating and ventilating, which, however, was required to be of the unit type."

The specifications of the Kernan School consist of some nine pages of typewritten matter, and, so far as I can understand, the only reference to a ventilating system is the following:

"The system of heating is to be that known as the multiple unit system. A unit or units is to be placed in each room to be heated and ventilated, consisting of a motor fan or fans, a radiator, and means for moistening the air expelled from the unit; radiators to be provided with strong and proper steam and air valves of approved make, and proper provision to be made for controlling the heat and air. Direct radiators are also to be placed in the rooms for reinforcing the rooms supplied with the units and in other rooms where units are not called for. Direct radiators for all classrooms to be of the kind known as the wall type."

In other words, I assume the correctness of the statement in the answer to which reference has been made "that each bidder should

submit in detail a layout of his proposed system of heating and ventilating." These specifications are subject to the criticism made by Mr. Justice William S. Andrews in the case of Grace v. Forbes et al., 84 Misc. Rep. 138, 118 N. Y. Supp. 1062:

"Involved in the whole scheme provided by the statute is the rule that the proposals called for are proposals for furnishing certain specific materials and doing certain specific labor in accordance with the specifications which have been prepared. In other words, the board of contract and supply must decide what work it wishes done and how it wishes it done before it calls for bids. If this is to be anything more than a farce, if competition is what is desired, if a comparison of bids is to be made, all the bids must be for the same thing. If A. offers to lay a floor with pine, B. with oak, and C. with chestnut, there is no basis laid for a proper decision as to the lowest bid. In other words, the spirit of the statute requires that the plan of the work to be done be adopted before proposals are invited, to the end that all bids may be for the same thing, and that nothing may remain to be determined by the board but the question as to which figures are the lowest. The statute implies a common standard by which bidders are to be measured. It implies plans previously adopted, which are to be open to all. It implies a chance to bid for a contract which is to be adopted; not that a contract may be adopted, after bids are in, and in view of them."

While the above decision was addressed particularly to a case arising under section 120 of the Second Class Cities Law, which provides that:

"Specifications for the performance of any work and for the supply of any materials shall be prepared and set forth with sufficient detail to inform all persons proposing to bid therefor of the nature of the work to be done and of the materials to be supplied, and written or printed copies thereof shall be delivered to all applicants therefor"

—the principle is applicable to the facts in this case, unless there is a common standard by which bidders are measured, there is no competition.

[6] The city of Utica is a proper, but not a necessary, party. Wenk v. City of New York, 171 N. Y. 607, 615, 64 N. E. 509; Steele v. Village of Glen Park, 193 N. Y. 341, 349, 86 N. E. 26; Hicks v. Cocks et ano., 167 App. Div. 862, 153 N. Y. Supp. 776. The cases cited by the learned counsel for the defendants are distinguishable.

The injunction so far as it relates to the Academy building is dissolved, and so far as it affects the Kernan School is modified, so as to prevent the letting of a contract for ventilating under the present notice and specifications, but not to prevent a readvertising for bids under plans and specifications which correct the errors hereinbefore set forth.

Order, if not agreed upon, will be settled upon two days' notice.